Argued and submitted August 23, 1989, reversed January 31, reconsideration denied June 6, petition for review allowed July 3, 1990 (310 Or 133)

STATE OF OREGON,
*Respondent,*

*v.*

LINDA SUE CARGILL,
*Appellant.*

(DA369633-8805; CA A49496 (Control))

STATE OF OREGON,
*Respondent,*

*v.*

DAVID ROBERT CHAMBERS,
*Appellant.*

(DA369634-8805; CA A49497)

STATE OF OREGON,
*Respondent,*

*v.*

PETER ELIAS,
*Appellant.*

(DA369631-8805; CA A49498)

STATE OF OREGON,
*Respondent,*

*v.*

CHERIE LAMBERT HOLENSTEIN,
*Appellant.*

(DA369632-8805; CA A49499)

STATE OF OREGON,
*Respondent,*

*v.*

DAVID ROGER SHOUSE,
*Appellant.*

(DA39629-8805; CA A49500)

STATE OF OREGON,
*Respondent,*

*v.*

LOIS R. STRANAHAN,
*Appellant.*

(DA369630-8805; CA A49501)
(Cases Consolidated)

786 P2d 208

Leland R. Berger and Elizabeth Doran Jacobs, Portland, argued the cause for appellants. With them on the briefs were Evelyn Conroy Sparks, Geoffrey Squier Silver, and Jeffrey A. Strang, Portland.

Rives Kistler, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Before Joseph, Chief Judge,* and Riggs and Edmonds, Judges.

EDMONDS, J.

---

* Joseph, Chief Judge, *vice* Graber, Presiding Judge.

**EDMONDS, J.**

Defendants appeal their convictions for criminal trespass in the second degree. ORS 164.245. The trial court reduced the charges from Class C misdemeanors to violations. ORS 161.565(2). After a trial to the court, it found defendants guilty and gave each a sentence of discharge. ORS 137.010(7)(d); ORS 161.715.[1] We reverse.

Defendants stood on a sidewalk between the parking lot of the Fred Meyer store at 3805 S.E. Hawthorne in Portland and the store's main entrance, seeking signatures on several initiative petitions. Both the parking lot and the sidewalk were private property that Fred Meyer controlled.[2] A store employee, pursuant to company policy, directed defendants to leave. They refused to, which led to their arrests and convictions.

ORS 164.245(1) provides:

"A person commits the crime of criminal trespass in the second degree if the person enters or remains unlawfully in or upon premises."

These definitions in ORS 164.205 apply to ORS 164.245:

"(3)   'Enter or remain unlawfully' means:

"* * * * *

"(b)   To fail to leave premises that are open to the public after being lawfully directed to do so by the person in charge.

"(4)   'Open to the public' means premises which by their physical nature, function, custom, usage, notice or lack thereof or other circumstances at the time would cause a reasonable person to believe that no permission to enter or remain is required."

Defendants do not dispute that the store and the sidewalk are premises that are open to the public, that a person in charge

---

[1] A defendant who is convicted after pleading not guilty and is then given a sentence of discharge may appeal the judgment. ORS 138.040; ORS 161.715(4).

[2] One defendant who had collected signatures at the store for over forty years testified that the sidewalk was public until Fred Meyer obtained control of it during a remodeling in 1971. She also stated that Fred Meyer changed the main entrance to the store from one on a public sidewalk to the one where defendants were arrested. The former entrance is now an emergency exit.

ordered them to leave and that they failed to do so. They argue that the order to leave was not "lawful," because it was unconstitutional under Article I, section 8, and Article IV, section 1, of the Oregon Constitution. We hold that the order was not "lawful," because using it as the foundation for a criminal prosecution would improperly interfere with the people's right under Article IV, section 1,[3] to initiate legislation.

■   As a preliminary matter, we must decide the effect of a stipulation by the parties. Before the presentation of any evidence at trial, the parties stipulated that the state did not have to put on a *prima facie* case, that it could rest without putting on any evidence and that the defense would then put on evidence regarding the issue of whether the order to leave was lawful.[4]

---

[3] Article IV, section 1, provides, in relevant part:

"(1) The legislative power of the state, *except for the initiative and referendum powers reserved to the people,* is vested in a Legislative Assembly, consisting of a Senate and a House of Representatives.

"(2)(a) The people reserve to themselves the initiative power, which is to propose laws and amendments to the Constitution and enact or reject them at an election independently of the Legislative Assembly.

"(b) An initiative law may be proposed only by a petition signed by a number of qualified voters equal to six percent of the total number of votes cast for all candidates for Governor at the election at which a Governor was elected for a term of four years next preceding the filing of the petition.

"(c) An initiative amendment to the Constitution may be proposed only by a petition signed by a number of qualified voters equal to eight percent of the total number of votes cast for all candidates for Governor at the election at which a Governor was elected for a term of four years next preceding the filing of the petition." (Emphasis supplied.)

[4] This colloquy took place:

PROSECUTOR: "Yes. Just to get that clear, we're going to stipulate to essentially all the elements that the event occurred on May 4th, 1988 in Multnomah County, State of Oregon; that all these defendants remained upon the premises located at 3805 S.E. Hawthorne after being told to leave by a person in charge.

"Your Honor, just to be clear about it, we — Mr. Kafoury and all the other people — attorneys — decided that in terms of what we're proceeding on, the only question will be the lawfulness of the order to leave and that that would be a — not a factual determination. So they are in the posture of raising it as a defense.

"So in other words, I don't have to —

COURT: "Sure.

PROSECUTOR: "I'm not going to be —

COURT: "In other words, they have stipulated —

PROSECUTOR: "— pleading on it, and they're in the posture now of raising their defense.

The state argues that the parties stipulated that defendants would have the burden of proving that the order to leave was unlawful because it was unconstitutional. We do not agree. "It is well recognized that the language of a stipulation * * * will not be so construed as to give it the effect of a waiver of a right not plainly intended to be relinquished." *Johnson v. Northwest Acceptance,* 259 Or 1, 7, 485 P2d 12 (1971). Even assuming that defendants could relinquish their right under ORS 161.055 to have the state prove that the order to leave was lawful,[5] the stipulation does not express a clear intention by defendants to do so.

■       The state also argues that *State v. Marbet,* 32 Or App 67, 573 P2d 736 (1978), places the burden of proof on defendants. Again, we do not agree. In *Marbet,* we held that the authority to order a person to leave premises may be limited or circumscribed by statutory or constitutional provisions and may be raised as a defense. We did not hold that a defendant who raises the defense also has the burden of proving it. Holding that would be contrary to ORS 161.055.

---

COURT: "They've stipulated to the elements of the charge?

PROSECUTOR: "Yes.

COURT: "And then you will rest and then they will present evidence —

PROSECUTOR: "On the lawfulness.

COURT: "Yes.

DEFENSE COUNSEL: "Technically, Your Honor, lawfulness is an element of the charge, so it's not technically a defense. We're not stipulating that it's lawful. We're saying that it would be lawful but for the constitutional issues so we're not sandbagging the State and they don't have to put on any evidence.

COURT: "Mr. Chambers [a defendant who was not represented], are you with us here?

MR. CHAMBERS: "Yes, I concur with everything.

COURT: "All right. Are you going to introduce the police reports or just leave it with that?

PROSECUTOR: "If that's enough, Your Honor, then that's what we'll —

COURT: "Let me ask all of the parties. Does any — do any of the defendants disagree with what has just been said or what has just been agreed to be done: That they stipulate to all of the elements, and the State will rest, and you put on your defense?

"Anybody object? Anybody that (indiscernible). Okay."

[5] ORS 161.055 provides, in relevant part:

"(1) When a 'defense,' other than an 'affirmative defense' as defined in subsection (2) of this section, is raised at a trial, the state has the burden of disproving the defense beyond a reasonable doubt."

■■ We next consider, as a matter of statutory construction, the "lawfulness" of an order to leave directed to a person who is gathering signatures on an initiative petition. Previous cases give us little guidance. Orders that a known shoplifter not enter any of a company's stores or that a disruptive person leave a public hearing are lawful. *State v. Ocean,* 24 Or App 289, 546 P2d 150 (1976); *see State v. Marbet, supra.* On the other hand, it would not usually be lawful to direct a person to leave because of the person's race, religion, sex, marital status, color or national origin. ORS 30.670 to ORS 30.685; *see also People v. Leonard,* 62 NY2d 404, 410, 465 NE2d 831 (1984). Although gathering signatures is an important part of the Oregon political process, no statute requires property owners as such to provide access for that purpose. *See* ORS ch 250. We therefore have no basis for holding that there is a *statutory* exemption to ORS 164.245 for persons who are directed to leave because they are gathering signatures. We turn, then, to whether it is constitutional for the order in this case to be the foundation for a criminal prosecution.

Defendants, when seeking signatures on the petitions, were exercising their rights to function as part of the legislative branch of the state government. In *Straw v. Harris,* 54 Or 424, 103 P 777 (1909), the Supreme Court said:

> "By the adoption of the initiative and referendum into our constitution, the legislative department of the State is divided into two separate and distinct law-making bodies. There remains, however, as formerly, but one legislative department of the State. It operates, it is true, differently than before—one method by the enactment of laws directly, through that source of all legislative power, the people; and the other, as formerly, by their representatives—but the change thus wrought neither gives to nor takes from the legislative assembly the power to enact or repeal any law, except in such manner and to such extent as may therein be expressly stated. Nor do we understand that it was ever intended that it should do so. The powers thus reserved to the people merely took from the legislature the exclusive right to enact laws, at the same time leaving it a co-ordinate legislative body with them. This dual system of making and unmaking laws has become the settled policy of the State, and so recognized by decisions upon the subject." 54 Or at 430.

*See also Hall v. Dunn,* 52 Or 475, 485, 97 P 811 (1908); *Kadderly v. Portland,* 44 Or 118, 145-46, 74 P 710, 75 P 222 (1904).

■ It is implicit in Article IV, section 1, that the people must have adequate opportunities to sign the petitions that are necessary for them to act as legislators. When the people adopted the initiative and referendum, there were ample opportunities to collect signatures. Parks, town squares and courthouses were common gathering places, and store entrances were usually directly off public sidewalks. The people could meet and conduct their legislative business on public property.

Today, the situation has substantially changed. Parks and courthouses are not the only, or even primary, foci of modern life. Many people who seldom go to those places now congregate at shopping centers. Privately owned stores and shopping centers typically are connected to privately owned parking areas, and stores are constructed so that entrances open on private property rather than on public sidewalks. *See* note 2, *supra.* Every part of a store or shopping center where it is feasible to seek signatures for initiative or referendum petitions is often privately owned.

Other courts have recognized the change in societal habits as to where citizens congregate. In *Food Employees v. Logan Valley Plaza,* 391 US 308, 88 S Ct 1601, 20 L Ed 2d 603 (1968), the Court said:

> "Here * * * the sidewalks leading from building to building are the functional equivalents of the * * * sidewalks of a normal municipal business district. The shopping center premises are open to the public to the same extent as the commercial center of a normal town."[6] 391 US at 319.

In *Lloyd Corporation v. Whiffen,* 307 Or 674, 773 P2d 1293 (1989), the Supreme Court said:

> "Plaintiff claims that defendants have full access to traditional public forums, such as the public park, sidewalks, and streets adjoining plaintiff's private property. But the public does not gather in the public park or use the outside sidewalks in great number. The process of gathering signatures is substantially impaired—almost doubled in time—if conducted on the public walkways or in parks instead of in the mall and on

---

[6] The Court overruled *Logan Valley* in *Hudgens v. NLRB,* 424 US 507, 96 S Ct 1029, 47 L Ed 2d 196 (1976). Whether or not we would accept the reasoning of *Logan Valley* or of *Hudgens* under Article I, section 8, the Court correctly described the nature of a modern shopping center.

its walkways. Shopping malls have become part of American life. Large numbers of the public gather there. Although plaintiff tries to cloak a public mall as a private place, it is the antithesis of a private place.'"[7] 307 Or at 685.

The changes have had a major effect on gathering signatures for initiative petitions. A witness with extensive experience in collecting signatures testified that access to the entrances to Fred Meyer stores is worth between 10,000 and 20,000 signatures.[8] The trial court found that several measures might not appear on the ballot if those supporting them could not collect signatures at Fred Meyer stores.

The Fred Meyer store at which defendants were arrested is a modern replacement for the town square or park. It is open to the public, and citizens are invited to come and congregate on the premises. At trial, Fred Meyer's president and chief operating officer described the company's "one-stop shopping center" concept as

"many departments * * * selling different kinds of merchandise * * * together in a single store providing customers a wide selection of merchandise under one single common set of customer-pleasing service policies."

He testified that a person could "get a very wide range of their

---

[7] Local governments recognize the role that shopping centers now play. An editorial from the December 24, 1989, Portland *Oregonian* begins:

"Angry at your mayor or city council? Don't go to city hall, go to your local shopping center.

"That may be the way of local government someday in Kansas City, Charlotte, N.C., and Tampa, Fla. Those cities have connected city government to shopping malls via user-friendly computer terminals.

"According to 'Public Innovation Abroad,' a newsletter published by the International Center, Academy for State and Local Government, Orlando, Fla., Dallas, Texas, and Albuquerque, N.M., also are considering installing two-way communications equipment in selected places throughout their cities."

[8] The same witness also testified:

"Usually when you start petitioning, you start in downtown Portland which is one of the best places in the very beginning. But then you have what is—you experience after, oh, a number of months, the saturation problem. You run into the same people over and over, and the number of signatures that come in become less and less.

"The thing that's—the thing that's important about Fred Meyer's is you're talking about an entity that has a number of stores throughout the state. I mean, there's a Fred Meyer's in Newport; there's a Fred Meyer's in Gresham; there's a Fred Meyer's everywhere. And they advertise themselves as one-stop-shopping experiences. They take away, basically, the people that would normally flow into the downtown area, and this is our chance to get to those people who not normally [sic] would come into the Portland area."

[*sic*] ordinary consumer needs from a Fred Meyer store" and that the company would "like people to spend every dollar that they have to spend at Fred Meyer." He also stated that the company had benches as well as "community bulletin boards" in "some" of its stores and that people can put up notices on such boards, subject to certain requirements and under the direction of a store manager.

The witness further testified that there are about 25 Fred Meyer stores in the Portland area, that "many * * * stores certainly have more than a thousand [shoppers] in a day" and that, although "some of [the] stores have independent businesses * * * in [their] complex[es]," there are no Fred Meyer stores in a shopping center "mall." The witness responded in the affirmative to the question of whether "people can just come in to Fred Meyer, look at the bulletin board, sit on the bench, pretty much hang out." When he was asked whether it would "be fair to say [that the company does not] care what people talk about in [its stores] as long as they are not disruptive or interfering with the commercial activities that goes [*sic*] on," he answered, "I think that's fair." He stated that "some of [the stores'] restaurants are places where groups of people seem to get together on a regular basis and just converse and drink their coffee and have social contact."

■ Although Article IV, section 1, implicitly protects an individual's right to gather signatures for an initiative or referendum petition, the state argues that that right does not confer a right of access to private property over the objection of its owner. To do so, arguably, would violate the Fifth and Fourteenth Amendments of the U.S. Constitution[9] and Article I, sections 10 and 18, of the Oregon Constitution.[10] Other

---

[9] The Fifth Amendment provides, in relevant part:

"[N]or shall private property be taken for public use, without just compensation."

The Fourteenth Amendment provides, in relevant part:

"[N]or shall any State deprive any person of life, liberty, or property, without due process of law * * *."

[10] Article I, section 10, provides:

"No court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay, and every man shall have remedy by due course of law for injury done him in his person, property, or reputation."

Article I, section 18, provides:

"Private property shall not be taken for public use, nor the particular services of

courts have assessed similar arguments.

In *Lloyd Corporation v. Whiffen, supra,* the plaintiff sought an injunction to bar the defendants from collecting signatures on petitions in the common areas of the plaintiff's shopping center. The Supreme Court held that the plaintiff had not established grounds for injunctive relief. Although it based its decision on equitable rather than constitutional grounds, it had to evaluate the importance of the defendants' activities. In doing so, it recognized that Article IV, section 1, and the provisions of ORS chapter 250 that implement it, do not create a right to go anywhere one likes in pursuit of signatures. However, it also recognized a strong public interest in facilitating the initiative and referendum process and that denying access to shopping centers would seriously damage that public interest.[11]

*Alderwood Assocs. v. Envtl. Council,* 96 Wash 2d 230, 635 P2d 108 (1981), held that the state constitution's initiative provisions granted the defendants the right to seek initiative signatures in the common areas of a shopping center. Although it reached its conclusion by balancing what it treated as conflicting rights, it relied heavily on the shopping

---

any man be demanded, without just compensation; nor except in the case of the state, without such compensation first assessed and tendered; provided, that the use of all roads, ways and waterways necessary to promote the transportation of the raw products of mine or farm or forest or water for beneficial use or drainage is necessary to the development and welfare of the state and is declared a public use."

[11] In *Fred Meyer, Inc. v. Roberts,* 308 Or 169, 777 P2d 406 (1989), the Supreme Court considered a challenge to a ballot title for a proposed constitutional amendment. The proposal would create a right to collect signatures for initiatives and referenda in shopping center common areas and at entrances to premises open to the public. The Attorney General's title implied that such a right already existed. The court modified the title to remove that implication. It noted that *Lloyd Corporation v. Whiffen, supra,* did not decide the question and that "the state of the law is in issue." 308 Or at 174. Because the court did not need to resolve the issue, *Fred Meyer* does not give any guidance for this case.

In *Lenrich Associates v. Heyda,* 264 Or 122, 504 P2d 112 (1972), the Supreme Court held that the owner of a shopping center could prevent certain religious practices on its property. *Lenrich* does not control this case for two reasons. First, it did not involve the rights of initiative and referendum and, thus, did not implicate Article IV, section 1. Second, the court based its decision on its understanding that a contrary ruling would violate the owner's property rights under the Fifth and Fourteenth Amendments. *Pruneyard Shopping Center v. Robins,* 447 US 74, 100 S Ct 2035, 64 L Ed 2d 741 (1980), makes it clear that that concern was unfounded. We do not know what result the court would have reached in *Lenrich* if it had decided the case after *Pruneyard.*

center's role of "providing the functional equivalent of a town center or community business block." 96 Wash 2d 246.

*Batchelder v. Allied Stores International, Inc.,* 388 Mass 83, 445 NE2d 590 (1983), held that a candidate for office had the right to seek the necessary nominating signatures in the common areas of a large shopping center. It also emphasized the ways in which such centers have replaced traditional forums for the collection of signatures and based its decision on "the basic right of free election, which would be substantially impaired in the absence of access." 388 Mass at 93. It did not matter that the candidate had in fact managed to obtain the required signatures in other ways.

In *Pruneyard Shopping Center v. Robbins, supra* n 11, the United States Supreme Court held that the Fifth and Fourteenth Amendments did not bar a state court from deciding *under its own constitution* that its citizens could exercise their rights to free expression and petition in the common areas of a shopping mall and that that exercise did not constitute a "taking" of the owner's property rights under the federal constitution.[12] Although, it recognized that one of the essential sticks in the bundle of property rights is the right to exclude others, not every destruction or injury to a property right will constitute a constitutional "taking." Rather, that determination will depend on such factors as the nature of the government's action, its economic impact and any interference with reasonable expectation of benefits from the property such as return of investment.

Significantly, defendants did not enter the Fred Meyer store; rather, they stood on a sidewalk between the parking lot and an entrance. A police officer involved in defendants' arrests testified that

"[defendants] were standing in front of the entrance on the north side of the store. They had petitions in their hand [*sic*]. They were contacting people going in and out of the store and asking them to sign their petitions. They weren't unruly. I talked to several of them, and they answered questions for me. They seemed pleasant to myself. They weren't abusive to myself or to anybody."

[12] In *Lloyd Corp. v. Tanner,* 407 US 551, 92 S Ct 2219, 33 L Ed 2d 131 (1972), the Court held that anti-war activists who wished to distribute anti-war literature within a shopping center had no federal constitutional right to do so on private property.

In this case, Fred Meyer's invitation to the public was broad and for more than just commercial activity. Its premises, by reason of the owner's invitation, became a forum for assembly by the community. Notwithstanding the company's apparent policy against allowing petitioners on its property,[13] there is no evidence that defendants' activities substantially interfered with Fred Meyer's commercial activity, had a serious economic impact on the company or interfered with its "reasonable investment backed expectations."

A trial court must grant a motion for a judgment of acquittal "if the evidence introduced [at trial] is such as would not support a verdict against the defendant." ORS 136.445. Petitioners were engaged in a constitutionally protected activity. The interference with Fred Meyer's property interest was minimal or non-existent. Prosecuting defendants for criminal trespass for refusing to obey a direction to leave the entrance of the store under these circumstances would render inadequate the people's opportunity to function in their legislative role and would violate Article IV, section 1. The order that defendants leave, therefore, was not lawful.

■  Our analysis is the proper adaptation of the constitutional purpose of Article IV, section 1, to current societal habits and is necessary to preserve the people's power of initiative and referendum. Article IV, section 1, therefore, prohibits using a criminal prosecution to prevent the people from collecting signatures on initiative and referendum petitions in areas that have replaced traditional forums for the collection of signatures, so long as there is no substantial interference with the owner's use of the property for business or other purposes. The trial court erred in denying defendants' motion for a judgment of acquittal.[14]

Reversed.[15]

---

[13] Although Fred Meyer officials testified that the company does not permit petitioning, there was also testimony that petitioning was nonetheless sometimes allowed.

[14] We need not decide whether defendants' actions were protected under the speech and assembly rights of Article I, sections 8 and 26.

[15] Because of our disposition of this case, we do not discuss the other issues raised by the parties.