THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PAUL DIGUIDA, Defendant-Appellant.

First District (5th Division)   No. 1—88—1364

Opinion filed June 14, 1991.

James H. Reddy, Public Defender, of Chicago (James W. Younger, Jr., Assistant Public Defender, of counsel), for appellant.

John O'Malley, State's Attorney, of Chicago (Renee G. Goldfarb and David R. Butzen, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNULTY delivered the opinion of the court:

Defendant was charged with the misdemeanor offense of criminal trespass to land. Following a jury waiver, defendant was tried by the court, found guilty, sentenced to supervision and ordered to perform 20 hours of community service. Notice of appeal was timely filed.

The question presented for review is whether the criminal trespass to land statute (Ill. Rev. Stat. 1987, ch. 38, par. 21—3(a)) as applied in this case violated defendant's rights to speak, write, and publish freely and to participate in a free and equal election as guaranteed by article I, sections 2 and 4, and article III, section 3, of the Illinois Constitution of 1970.

On December 12, 1987, defendant Paul Diguida stood inside the cart control area of Dominick's Finer Food store at 525 East Chicago Avenue, Evanston, Illinois, and asked shoppers to sign a political nominating petition for a candidate for commissioner of the Cook County Board of Tax Appeals. The cart control area is outside the store building, but is covered by the building's overhang and is bounded by a railing which prevents shopping carts from passing into the parking lot. At that location, Dominick's is bordered by public sidewalks and an adjacent parking lot. Defendant was about 25 feet away from the store's entrance and did not prevent anyone from entering the store.

Ted Scanlon, one of Dominick's managers, saw defendant asking people to sign the petition and requested him to leave. When this manager asked defendant to leave and told him that the police would be called if he did not comply, defendant replied that he was not doing anything wrong. The police were called, but when they arrived, defendant had left the premises.

Shortly thereafter, Mr. Scanlon learned that defendant had returned and was asking people to sign the nominating petition. The police were again summoned. Officer Ralph Mier arrived and saw

defendant holding a clipboard with petitions outside the store. The officer told defendant he was on private property and that Dominick's management wanted him to leave. When defendant did not comply, he was arrested and charged in a misdemeanor complaint with criminal trespass to land.

At trial Mr. Scanlon testified that Dominick's maintained a policy against solicitation on its property. But on cross-examination he stated that the store allowed solicitation with permission. Moreover, there were no signs outside saying "No Soliciting." Mr. Scanlon further stated that although Dominick's did not allow people to solicit signatures, it did allow political candidates to walk through the store and shake hands with shoppers. He also testified that Dominick's provided a bulletin board located inside the store where people could leave messages.

Defendant called Andrea Raila to testify in his defense. Ms. Raila was a campaign manager who collected signatures for political candidates and directed others in the collection of signatures. She stated that solicitors went to Dominick's stores and that she had personally collected signatures there. During the past four years, she had collected signatures at Dominick's 20 to 25 times and was never asked to leave or threatened with arrest. She further testified that she had been permitted to engage in that activity in the store when the weather was inclement. This testimony was unrefuted.

At the conclusion of trial, the court found defendant guilty as charged and sentenced him as set forth above. This appeal followed.

As a prelude to the analysis of the instant case, a synopsis of Federal constitutional law on the exercise of first amendment rights on privately owned property is necessary.

In *Marsh v. Alabama* (1946), 326 U.S. 501, 90 L. Ed. 265, 66 S. Ct. 276, Marsh, a member of Jehovah's Witnesses, was convicted under Alabama's criminal trespass statute for distributing religious literature on a company-owned sidewalk in a company-owned town. The State contended that since the defendant engaged in these activities upon private, company-owned property, the landowner had the right to bar any activities it considered offensive. In reversing the conviction, the Supreme Court stated:

> "The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it. \*\*\*
>
> \*\*\* The \*\*\* corporation cannot curtail the liberty of press and religion of these people consistently with the purposes of

the Constitutional guarantees, and a state statute, as the one here involved, which enforces such action by criminally punishing those who attempt to distribute religious literature clearly violates the First and Fourteenth Amendments to the Constitution." *Marsh*, 326 U.S. at 506-08, 90 L. Ed. at 268-69, 66 S. Ct. at 278-80.

In *Marsh*, the corporation, by establishing the town, providing streets, sidewalks, commercial establishments and other municipal accoutrements, had, in fact, taken over functions normally carried out by government. Under these conditions, the Court observed:

"[T]he circumstance that the property rights to the premises where the deprivation of liberty, here involved, took place, were held by others than the public, is not sufficient to justify the state's permitting a corporation to govern a community of citizens so as to restrict their fundamental liberties and the enforcement of such restraint by the application of a state statute. In so far as the State has attempted to impose criminal punishment on appellant for undertaking to distribute religious literature in a company town, its action cannot stand." 326 U.S. at 509, 90 L. Ed. at 270, 66 S. Ct. at 280.

The holding of *Marsh* was extended in *Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza* (1968), 391 U.S. 308, 20 L. Ed. 2d 603, 88 S. Ct. 1601, the first of the "shopping center" cases. Logan Valley Plaza, Inc. (Logan), owned a large, newly developed shopping center complex known as Logan Valley Mall. At the time the events in question occurred, the mall was occupied by two businesses, Weis Markets, Inc. (Weis), and Sears Roebuck & Co. (Sears). Weis' property consisted of an enclosed supermarket building, an open porch along the front of the building, and a five-foot-wide parcel pick-up zone running 30 to 40 feet along the porch. There were also extensive macadam parking lots serving the entire mall.

When Weis opened for business, it employed a wholly nonunion staff of employees. A few days after opening, Weis posted a sign on the exterior of its building prohibiting trespassing or soliciting by anyone other than its employees on its porch or parking lot. A few days thereafter, members of Amalgamated Food Employees Union, Local 590, began picketing Weis. The pickets were not employees of Weis, but rather, were all employees of competitors of Weis. This activity went on for about 10 days, was carried out almost entirely in the parcel pick-up area and that portion of the parking lot immediately adjacent thereto. The picketing was peaceful.

Weis and Logan instituted court action, and an order issued enjoining the union from, *inter alia*, picketing and trespassing upon Weis' storeroom, porch, parcel pick-up area, and the Logan parking area. The effect of this order was to require that all picketing be carried on along the berms beside the public roads outside the shopping center.

The Supreme Court had to decide whether the first amendment protects peaceful picketing of a business enterprise located within a shopping center from being enjoined as an unconsented invasion of the property rights of the shopping center landowners. It was undisputed that if the peaceful picketing had been on public property, the first amendment would not permit it to be barred.

The Court noted that there were striking similarities between the business block in *Marsh* and the shopping center in the Logan Valley Mall. The fact that the general public had unrestricted access to the mall made the shopping center the functional equivalent of the business district in *Marsh*. Moreover, the fact that the shopping center owners could not totally bar the union's access to the community, as the company could in *Marsh*, was not determinative.

Conceding that the shopping center owners' property rights may, under State law, entitle them to limit the use of that property by members of the public in a manner not permissible were the property owned by a municipality, it found the union's activity in this case to be within the protection of the first amendment. It stated:

"All we decide here is that because the shopping center serves as the community business block 'and is freely accessible and open to the people in the area and those passing through,' [citation] the State may not delegate the power, through the use of its trespass laws, wholly to exclude those members of the public wishing to exercise their First Amendment rights on the premises in a manner and for a purpose generally consonant with the use to which the property is actually put." *Amalgamated*, 391 U.S. at 319-20, 20 L. Ed. 2d at 612-13, 88 S. Ct. at 1609.

The following factors were deemed important by the Court in extending the *Marsh* rationale to the facts of *Logan Valley*:

*First*, the picketing was directed solely at one business within the shopping center. To require the pickets to display their placards on the berms surrounding the shopping center, 350 to 500 feet away from the business, would render them indecipherable to Weis' customers to whom the communication was directed.

*Second,* unlike a situation involving a person's home, no meaningful claim to protection of a right to privacy can be raised by the shopping center owners, nor any significant claim to protection of the normal business operation of the property.

*Third,* because of the large scale population movement from the cities to the suburbs accompanied by the advent of the suburban shopping center, the latter does or will account for a significant amount of the country's commerce. This will mean substantial consequences forum-wise for workers seeking to challenge substandard working conditions, consumers protesting shoddy or overpriced merchandise, and minority groups seeking nondiscriminatory hiring policies. As the Court succinctly stated:

> "Business enterprises located in downtown areas would be subject to on-the-spot public criticism for their practices, but businesses situated in the suburbs could largely immunize themselves from similar criticism by creating a *cordon sanitaire* of parking lots around their stores. Neither precedent nor policy compels a result so at variance with the goal of free expression and communication that is the heart of the First Amendment." *Amalgamated,* 391 U.S. at 324-35, 20 L. Ed. 2d at 615-16, 88 S. Ct. at 1612.

*Lloyd Corp. v. Tanner* (1972), 407 U.S. 551, 33 L. Ed. 2d 131, 92 S. Ct. 2219, ushered in the sunset for *Logan Valley.* Lloyd Corporation (Lloyd) was the owner of a shopping center containing parking facilities, malls, private sidewalks, stairways, escalators, gardens, an auditorium, skating rinks, and a single, large multilevel building complex with stores therein. Lloyd put notices on the sidewalk that areas in the shopping center used by the public were not public ways, but were for the use of center tenants and the public transacting business with them. The signs further stated that use of these facilities could be revoked at any time.

The shopping center owners had a policy, strictly enforced, against distribution of handbills within the building complex and malls. Political use was prohibited except that presidential candidates of both parties had been allowed to speak in the auditorium.

The Court held in *Lloyd* that there had been no dedication of the shopping center to public use entitling persons to first amendment protection who distributed handbill invitations to a meeting to protest the draft and the Vietnam War. The Court noted that Lloyd permitted very limited use of the premises for political purposes, the message sought to be conveyed was not related to shopping center commercial

activities, and there were other reasonable and legal opportunities on public property to convey the protestors' communication.

*Logan Valley* was limited to the particular facts involved therein, to wit: (1) the picketing was directly related in its purpose to the use to which the shopping center was being put, and (2) no other reasonable means were available for the pickets to convey their message to the intended audience.

Sundown for *Logan Valley* came in *Hudgens v. NLRB* (1976), 424 U.S. 507, 47 L. Ed. 2d 196, 96 S. Ct. 1029. Striking members of a union picketed in front of their employer's leased store located in a privately owned shopping center. The shopping center's general manager threatened them with arrest for criminal trespass if they did not leave, and they complied. The strikers in legal action subsequently claimed that they had a first amendment right to picket in the shopping center.

The Court applied the rationale of *Lloyd* in holding that the pickets did not have a first amendment right to enter a privately owned shopping center for the purpose of advertising their strike against their employers contrary to the wishes of the shopping center owners. The Court held that *Logan Valley* did not survive the rationale supporting the decision in *Lloyd* and overruled it.

The Court declared that the first amendment provides no protection or redress from the abridgement of free expression by a private corporation or person except under circumstances enumerated in *Marsh*. In *Hudgens*, the picketing was not desired by the private shopping center owner on his premises. Therefore, the first amendment affords no protection to that activity because the abridgement is due to the action of a private person and not that of a governmental entity.

*People v. Sterling* (1972), 52 Ill. 2d 287, 287 N.E.2d 711, is the only Illinois case involving first amendment free speech rights in a privately owned shopping center milieu. This case was decided after *Lloyd*, but prior to the interment of *Logan Valley* by *Hudgens*.

In *Sterling*, defendant and six others entered a shopping center to distribute leaflets. The leaflets contained the text of a letter directed to a local newspaper which the newspaper had refused to print. The letter dealt with the racial situation in Cairo, Illinois, and criticized the newspaper's reporting of the incidents. The shopping center was controlled exclusively by the owners through the Eastland Merchants Association. Defendants were charged with and convicted of criminal trespass to land after being directed to leave the center by the president of the merchants' association and refusing to do so.

Defendants claimed that their conviction under the trespass statute deprived them of their right to free speech under the first and fourteenth amendments. In rejecting defendants' claim, the Illinois Supreme Court found defendants' reliance on *Logan Valley* misplaced. *Logan Valley* involved picketing directly related in purpose to the commercial use of the shopping center property, the denial of which would effectively deprive the picketers of all reasonable opportunity to convey their message to the intended recipients.

The court in *Sterling* cited with approval the approach taken by the U.S. Supreme Court in *Lloyd*, which rejected first amendment claims of persons barred from distributing anti-war literature in a privately owned shopping center where the literature was not related to the operation of the center or its businesses, and other opportunities to convey their message were available.

In the instant case, the State argues that *Sterling* is controlling because defendant's free speech rights under the Illinois Constitution of 1970 should be interpreted no more broadly than the protections afforded under the first amendment. For the reasons set forth below, our analysis cannot end with *Sterling* nor is it dispositive of the instant case.

*First*, the constitutional claims advanced are different. In *Sterling*, the supreme court considered only defendant's claims under the first amendment. Contrary to the instant case, the court was never presented with a claim that the activities engaged in were protected by the free speech provision of article I, section 4, of the 1970 Illinois Constitution or the due process protection of article I, section 2, of the 1970 Illinois Constitution. Additionally, the defendant in the instant case claims his activities were protected by article III, section 3, of the 1970 Illinois Constitution guaranteeing free and equal elections. This assertion could not have been advanced in *Sterling* due to the nature of the activities there involved.

*Second*, the facts of *Sterling* are materially different from those in the instant case. In *Sterling* the use of the shopping mall had always been related to the commercial business of the stores in the center for promotional activities such as fashion shows, automobile exhibits and by service groups with permission. (52 Ill. 2d at 289.) Therefore, the shopping center owners had never engaged in a pattern of activity or course of conduct leading defendants to believe that use of the mall for leaflet distribution was permitted.

In the instant case, political activity had been permitted in Dominick's store and in its immediate vicinity. Mr. Scanlon testified that political candidates were permitted to enter the store and shake

hands with customers. Further, a bulletin board for messages was provided by the store. No evidence was presented that Dominick's prohibited the posting of political messages on this board.

Although Mr. Scanlon testified that solicitation of signatures on political nominating petitions was not permitted, Ms. Andrea Raila testified that she had sent signature solicitors to Dominick's and personally had gone to the cart area of Dominick's 20 to 24 times in the past four years to collect signatures on political nominating petitions without complaint or interference by Dominick's personnel. She further testified that she had been permitted to engage in the activity in the store in inclement weather. This testimony was unrefuted.

Defendant in the instant case bases his entire constitutional argument on protections he claims under the Illinois Constitution. Defendant concedes that the activity in which he engaged in the cart area of Dominick's store is not protected under the first amendment as set forth by the U.S. Supreme Court in *Lloyd* and *Hudgens*. We agree with that analysis and further conclude that his constitutional position under the first amendment is not enhanced by the fact that he was collecting signatures on political nominating petitions rather than distributing leaflets or peacefully picketing. Therefore, the first amendment cases discussed above including *Sterling* are not dispositive.

We now determine whether the activity in which defendant engaged is protected under the free speech and/or free and equal elections provisions of the State Constitution. Since there are no Illinois cases on point, an appropriate introduction to this question can be found in the U.S. Supreme Court decision in *Pruneyard Shopping Center v. Robins* (1980), 447 U.S. 74, 64 L. Ed. 2d 741, 100 S. Ct. 2035.

Appellant (Pruneyard) was a privately owned California shopping center covering about 21 acres, five devoted to parking and 16 occupied by walkways, plazas, sidewalks and buildings containing more than 65 specialty shops, 10 restaurants and a movie theater. It was open to the public for the purpose of encouraging the patronizing of its commercial establishment. It had a policy prohibiting any visitor or tenant from engaging in any publicly expressive activity, including circulation of petitions, that was not directly related to its commercial purposes. This policy had been strictly enforced in a nondiscriminatory fashion.

Appellees were high school students who entered Pruneyard premises to solicit support for their opposition to a United Nations resolution against "Zionism." They set up a card table in the courtyard, distributed pamphlets, and asked passersby to sign petitions to

be sent to the President and members of Congress. There was no evidence in the record that these activities were objected to by Pruneyard's patrons.

A security guard informed the students that they must leave because their activities violated Pruneyard's regulations. He suggested that they move to the public sidewalk at Pruneyard's perimeter. They left and subsequently filed suit in State court to enjoin Pruneyard from denying them access to the shopping center for the purpose of circulating their petitions. The California Supreme Court upheld appellees' right of access, holding that the California Constitution protects "speech and petitioning, reasonably exercised, in shopping centers even when the centers are privately owned."[1] *Robins v. Pruneyard Shopping Center* (1979), 23 Cal. 3d 899, 910, 592 P.2d 341, 347, 153 Cal. Rptr. 854, 860.

The California Supreme Court observed:

> "It bears repeated emphasis that we do not have under consideration the property or privacy rights of an individual homeowner or the proprietor of a modest retail establishment. As a result of advertising and the lure of a congenial environment, 25,000 persons are induced to congregate daily to take advantage of the numerous amenities offered by the [shopping center there]. A handful of additional orderly persons soliciting signatures and distributing handbills in connection therewith, under reasonable regulations adopted by defendant to assure that these activities do not interfere with normal business operations would not markedly dilute defendants' property rights." 23 Cal. 3d at 910-11, 592 P.2d at 347-48, 153 Cal. Rptr. at 860-61.

In reaching this conclusion, the California Supreme Court overruled its earlier decision to the contrary. See *Diamond v. Bland* (1974), 11 Cal. 3d 331, 521 P.2d 460, 113 Cal. Rptr. 468.

On appeal to the U.S. Supreme Court, Pruneyard contended that its fourteenth amendment right to exclude appellees from the adverse use of its private property could not be denied by invocation of a State constitutional provision or by judicial reconstruction of a State's laws of private property.

---

[1] Article 1, section 2, of the California Constitution provides:

"Every person may fully speak, write and publish his or her sentiments on all subjects being responsible for the abuse of that right. A law may not restrain or abridge liberty of speech or press."

In rejecting Pruneyard's argument, the Court held that its decision in *Lloyd* does not *"ex proprio vigore* limit the authority of the State to exercise its police power or its sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution." *(Pruneyard,* 447 U.S. at 81, 64 L. Ed. 2d at 752, 100 S. Ct. at 2040.) A State in the exercise of its police power may adopt reasonable restrictions on private property as long as the restrictions do not amount to a taking without just compensation or contravene any other Federal constitutional provision.

In response to Pruneyard's contention that its right to exclude others is guaranteed by the fifth amendment prohibition against the taking of property without just compensation and the fourteenth amendment guarantee against deprivation of property without due process of law, the Court observed that not every destruction or injury to property by governmental action is a "taking" in the constitutional sense. That determination requires an examination of the character of the government action, its economic impact, and its interference with reasonable investment backed expectations. The Court found Pruneyard had failed to demonstrate that prohibiting it from barring the activities engaged in by appellees would impair the value or use of its property as a shopping center.

In examining the California Supreme Court's decision in *Pruneyard,* the U.S. Supreme Court applied the rational relation test, determining the due process guaranty demands only that the law shall not be unreasonable, arbitrary or capricious, and the means selected shall have a real and substantial relation to the objective sought to be attained. *(Nebbia v. New York* (1934), 291 U.S. 502, 78 L. Ed. 940, 54 S. Ct. 505.) Here, this test was satisfied by the State's asserted interest in promoting more expansive rights of free speech and petition than those conferred by the Federal Constitution. The holding in *Pruneyard* therefore permits State courts some latitude in interpreting State constitutional free speech protections more generously than those provided by the first amendment of the Federal Constitution.

Although the Illinois Supreme Court to date has been unwilling to construe protections against self-incrimination and unreasonable search and seizure in the 1970 Illinois Constitution more broadly than those afforded by the Federal Constitution, this approach has not been free of criticism and was not followed on the issue of the State's right to jury trial in criminal cases.

In *People v. Hoskins* (1984), 101 Ill. 2d 209, 461 N.E.2d 941, Justice Simon wrote in dissent:

"The time has come for the Illinois Supreme Court to recognize its independent obligation to interpret the bill of rights contained in the Illinois Constitution, and to make its own assessment of the appropriate balance between the privacy rights of our citizens and the legitimate requirements of law enforcement." 101 Ill. 2d at 236 (Simon, J., dissenting).

See also *People v. Rolfingsmeyer* (1984), 101 Ill. 2d 137, 461 N.E.2d 410.

In *People v. Tisler* (1984), 103 Ill. 2d 226, 469 N.E.2d 147, the supreme court again employed the "lock step" approach in determining State search and seizure protections to be no greater than those offered by the Federal constitution. However, Justice Ryan, writing for the majority, stated that for greater State constitutional protections to be granted, "[w]e must find in the language of our constitution, or in the debates and the committee reports of the constitutional convention, something which will indicate that the provisions of our constitution are intended to be construed differently than are similar provisions in the Federal Constitution, after which they are patterned." 103 Ill. 2d at 245.

The court found such a case in *People ex rel. Daley v. Joyce* (1988), 126 Ill. 2d 209, 533 N.E.2d 873. The State argued that it had a right to demand a jury trial after defendant had waived it. The United States Supreme Court declared in *Singer v. United States* (1965), 380 U.S. 24, 13 L. Ed. 2d 630, 85 S. Ct. 783, that the Federal Constitution did not prohibit the government from demanding a jury trial after waiver by the defendant. For the first time, the Illinois Supreme Court declared that comparable provisions of the Federal and State Constitutions had in this instance independent meanings.

The language of the Illinois Constitution of 1970, as well as the drafters' debates, convinced the court that the difference between the jury trial provisions of the State Constitution and that of the Federal Constitution was "one of substance and not merely one of form." (*Joyce*, 126 Ill. 2d at 214.) The court found that Illinois law viewed the waiver of a jury as a constitutionally protected personal right of the defendant. (126 Ill. 2d at 222.) The court's approach in this case was approved by Justices Simon and Clark, who concluded it to be more consistent with the Founding Fathers' vision of the State's important role in protecting individual liberties.

The instant case is one of first impression in Illinois. The question of whether or not the Illinois Constitution grants greater rights of free speech than the Federal Constitution has been infrequently addressed by Illinois courts. However, in *Village of South Holland v.*

*Stein* (1940), 373 Ill. 472, 26 N.E.2d 868, the Illinois Supreme Court observed for the first time that "[t]he constitution of Illinois is even more far-reaching than that of the constitution of the United States in providing that every person may speak freely, write and publish on all subjects, being responsible for the abuse of that liberty." 373 Ill. at 479. Accord *City of Blue Island v. Kozul* (1942), 379 Ill. 511, 41 N.E.2d 515; *Montgomery Ward & Co. v. United Retail, Wholesale & Department Store Employees of America, C.I.O.* (1948), 400 Ill. 38, 79 N.E.2d 46.

The debates connected with the adoption of the 1970 Illinois Constitution clearly show that the delegates intended article I, section 4, to be independent of the Federal Constitution. (See J. Cornelius, *Constitution Making in Illinois 1818-1970* (1972); Seng, *Freedom of Speech, Press and Assembly, and Freedom of Religion Under the Illinois Constitution,* \_\_\_\_ Loy. U. Chi. L.J. \_\_\_\_.) Although the delegates acknowledged the Federal Constitution's supremacy in the event of conflict, they also recognized that the Illinois speech and press provisions could be interpreted more expansively than their Federal counterparts.

Other States have recognized that their State constitutions afford greater protection to the exercise of free speech rights by individuals on privately owned property than does the United States Constitution. See *Alderwood Associates v. Washington Environmental Council* (1981), 96 Wash. 2d 230, 635 P.2d 108 (environmentalists soliciting signatures and peacefully demonstrating in a privately owned shopping center were engaged in constitutionally protected activities); *Pruneyard*, 23 Cal. 3d 899, 592 P.2d 341, 153 Cal. Rptr. 854; *State v. Schmid* (1980), 84 N.J. 535, 423 A.2d 615 (leaflet distribution on the campus of Princeton university was constitutionally protected, but the university could subject the distributor to reasonable regulations to prevent disruption of campus activities); *Batchelder v. Allied Stores International, Inc.* (1983), 388 Mass. 83, 445 N.E.2d 590. Contra *Bock v. Westminster Mall Co.* (Colo. App. 1990), 797 P.2d 797; *Cologne v. West Farms Associates* (1984), 192 Conn. 48, 469 A.2d 1201; *Woodland v. Michigan Citizens Lobby* (1985), 423 Mich. 188, 378 N.W.2d 337.

The cases referred to above also dealt with the issue of whether the State constitution required State action to bring free speech activity within its protection, as the Federal Constitution requires. In *Alderwood*, the Washington Supreme Court compared the language of the First Amendment ("Congress shall make no law *** abridging the freedom of speech") with that of its State constitution ("Every person may freely speak, write and publish in all subjects, being responsible

for the abuse of that right") and concluded that State action was not required. Accord *Pruneyard*, 23 Cal. 3d 899, 592 P.2d 341, 153 Cal. Rptr. 854; *State v. Schmid*, 84 N.J. 535, 423 A.2d 615; *Batchelder* (1983), 388 Mass. 83, 445 N.E.2d 590. Contra *Bock v. Westminster Mall Co.* (Colo. App. 1990), 797 P.2d 797; *Cologne v. West Farms Associates*, 192 Conn. 48, 469 A.2d 1201; *Woodland v. Michigan Citizens Lobby*, 423 Mich. 188, 378 N.W.2d 337.

The free speech provisions of the Illinois Constitution are also different from the provisions of the first amendment and almost identical to those of the Washington and California constitutions. *Alderwood, Robins, Schmid* and *Batchelder* found the free speech guarantees under their respective State constitutions were not limited by their terms to deprivation by governmental action, but also to deprivation by private parties under appropriate circumstances. This conclusion is also permitted under free speech provisions of the Illinois Constitution.

■ Even assuming, *arguendo*, that State action is required to trigger the free speech protections of the Illinois Constitution, that element exists in the instant action through use of the criminal trespass laws. *Hudgens* did not reject the function of criminal trespass laws in supplying the requisite State action as set forth in *Marsh*. The development of first amendment law from *Marsh* through *Hudgens* was principally concerned with the reach of substantive constitutional protection for expressive activity on privately owned premises, and not with the limits of the State action doctrine. Consequently, we conclude that the definition of common law property rights and their enforcement against the defendant in the instant case through criminal trespass laws constitute State action. (See *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710; *Shelley v. Kraemer* (1948), 334 U.S. 1, 92 L. Ed. 1161, 68 S. Ct. 836.) The analysis set forth above supports the conclusion that defendant was engaged in free speech activities protected by the State Constitution. Therefore, the use of the State's criminal trespass laws to punish them constitutes State action. *Marsh v. Alabama* (1946), 326 U.S. 501, 90 L. Ed. 265, 66 S. Ct. 276; see also *Moose Lodge No. 107 v. Irvis* (1972), 407 U.S. 163, 32 L. Ed. 2d 627, 92 S. Ct. 1965 (the use of a State licensing regulation to enforce a private club's racially discriminatory bylaws was State action).

Finally, since defendant claims that his activities in the instant case were also protected by the free and equal elections provisions of the State Constitution, and there is no Illinois case on point, analysis

of a Massachusetts and an Oregon case considering the issue under State constitutional provisions is appropriate.

In *Batchelder v. Allied Stores International, Inc.* (1983), 388 Mass. 83, 445 N.E.2d 590, Batchelder entered a privately owned shopping center for the purpose of obtaining signatures and distributing printed material in support of both his nomination for Congress and his party's candidate for President. His solicitation was orderly and quiet. The shopping center was the largest retail shopping mall in Massachusetts. It had scheduled special events almost every week, some charitable, some civic, and some entertainment. The shopping center consistently applied a nondiscriminatory policy concerning political campaigning. No solicitation of signatures was permitted, but candidates already on the ballot might appear at the shopping center and shake hands with voters.

A security guard advised Batchelder that soliciting signatures and distributing political literature were not allowed at the shopping center. Batchelder objected, but left the premises. He subsequently sued to enjoin the shopping center owners from interfering with his ballot access activities under the freedom of speech and free elections provisions of the Massachusetts Constitution.

The Supreme Judicial Court of Massachusetts upheld Batchelder's right to engage in the above-described activities under the free elections provision of the State constitution.[2] The Massachusetts court noted that a majority of State courts that have considered protection under State constitutions of the right to engage in orderly free speech, free assembly, or electoral activity on private property held open to the public have recognized such rights, citing *Pruneyard, Schmid, Commonwealth v. Tate* (1981), 495 Pa. 158, 432 A.2d 1382, and *Alderwood Associates v. Washington Environmental Council.*

It then balanced the rights of the private property owner with the right of an individual to ballot access to determine whether Batchelder's activities were protected under the Massachusetts Constitution. In concluding that they were, the court relied on the free elections provisions rather than the free speech provisions of that law. It noted that ballot access is of fundamental importance because it is

---

[2]Declaration of Rights of the Constitution of the Commonwealth, Article 9:
"All elections ought to be free; and all inhabitants of this Commonwealth, having such qualifications as they shall establish by their frame of government, have an equal right to elect officers, and/or be elected, for public employments."

through the ballot that people control their government. *Batchelder*, 388 Mass. at 92, 445 N.E.2d at 595.

> "The difference between free speech and *** rights to free elections and to be a candidate equally with others is not purely theoretical. Ideas and views can be transmitted through the press, by door-to-door distributions, or through the mail, without personal contact. On the other hand, a person needing signatures for ballot access requires personal contact with voters ***. Reasonable access to the public is essential in ballot access matters." 388 Mass. at 92, 445 N.E.2d at 595.

The fact that Batchelder's activities took place on private property was given careful consideration by the Court. However, his activities were largely related to the basic right of a free election, which would be substantially impaired in the absence of access. The shopping center owner did not demonstrate that Batchelder's solicitations had adversely affected its economic interests, or that his views could reasonably be attributed to the owner. Since the shopping center owner did permit political candidates already on the ballot to shake hands with patrons at the mall, the Court concluded that Batchelder's activities were not a significant intrusion on the owner's interests. Furthermore, the court did not consider significant the fact that Batchelder had managed to obtain the required signatures in other ways.

*State v. Cargill* (1989), 100 Or. App. 336, 786 P.2d 208, *petition for review allowed* (1990), 310 Or. 133, 794 P.2d 794, presented a fact pattern strikingly similar to the instant case. In *Cargill*, defendants stood on the sidewalk between the parking lot of a department store and its main entrance seeking signatures on several initiative petitions. Both the parking lot and the sidewalk were private property controlled by the department store. A store employee, pursuant to company policy, directed defendants to leave. They refused, were arrested and convicted under the Oregon criminal trespass to land statute. The Oregon Appellate Court held that the initiative and referendum provisions of the Oregon Constitution prohibited using criminal prosecution to prevent people from collecting signatures on initiative and referendum petitions in areas that have replaced traditional forums for the collection of signatures, so long as there is no interference with the owner's use of the property for business or other purposes.

The court stated:

> "When the people adopted the initiative and referendum, there were ample opportunities to collect signatures. Parks, town

squares and courthouses were common gathering places, and store entrances were usually directly off public sidewalks. * * *

Today, the situation has substantially changed. Parks and courthouses are not the only, or even primary, foci of modern life * * *. Privately owned stores and shopping centers typically are connected to privately owned parking areas, and stores are constructed so that entrances open on private property rather than public sidewalks. Every part of a store or shopping center where it is feasible to seek signatures for initiative or referendum petitions is often privately owned." 100 Or. App. at 343, 786 P.2d at 211.

The court further found that the changes referred to above have had a major effect on gathering signatures for initiative petitions, and that the department store at which defendants were arrested was a modern replacement for the town square or park. It was open to the public, citizens were invited to come and congregate on the premises with company benches and community bulletin boards provided for that purpose.

■ In summary, we hold that defendant's activities, given the unique facts of this case, are protected by the free speech and free elections provisions of the Illinois Constitution. In so determining, we do not decide whether Dominick's could have prohibited all political activity on its premises. Nor do we determine whether Dominick's could have barred defendant's particular activities by posting signs on its premises giving notice that such political activity was prohibited. In this case Dominick's permitted political activity on its premises and there were no signs posted prohibiting such activity. Furthermore, there is unrefuted testimony in the record that Dominick's, on numerous occasions, permitted the same political activity on its premises for which defendant was arrested and convicted. The store owner voluntarily and affirmatively created a public forum or accommodation for expressionist activity, by inviting or permitting members of the general public to engage in noncommercial expressive conduct of a civic or community nature in the common areas of the store. Under those circumstances, the owner cannot, at the same time, exclude particular expressionists upon purely discriminatory or arbitrary grounds. Dominick's, by prosecuting defendant for engaging in political activities on its premises, while permitting others to engage in the same or similar activities thereon, suggests that it objected to the defendant and/or his candidate rather than political activity *per se*. This is precisely the type of censorship the constitutional provisions referred to above were intended to prevent. (See *Shad Alliance v. Smith Haven*

*Mall* (1985), 66 N.Y.2d 496, 507, 488 N.E.2d 1211, 1218, 498 N.Y.S. 2d 99, 106 (Jasen, J., concurring).) Therefore, the use by Dominick's of the Illinois criminal trespass statute to prosecute and punish defendant for his political activities constituted State action under *Marsh*. Furthermore, as applied to this defendant given the facts of this case, such action contravened article I, sections 2 and 4, and article III, section 3, of the Illinois Constitution of 1970. Ill. Const. 1970, art. I, §§2, 4; Ill. Const. 1970, art. III, §3.

For the reasons set forth above, the judgment of the circuit court of Cook County is reversed.

Reversed.

LORENZ, P.J., and GORDON, J., concur.