Argued and submitted March 6, 1992, reassigned February 4 and April 8, decision of
the Court of Appeals affirmed on different grounds; judgment of the district court
reversed May 28, 1993

STATE OF OREGON,
*Petitioner on Review,*

*v.*

WILLIAM C. DAMERON,
*Respondent on Review.*

(DC D881992M; CA A60258; SC S37145)

853 P2d 1285

Rives Kistler, Assistant Attorney General, Salem, argued the cause and filed the petition for petitioner on review. With him on the petition were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Steven L. Price, Hillsboro, argued the cause for respondent on review.

Charles F. Hinkle, of Stoel Rives Boley Jones & Grey, Portland, filed a brief for *amicus curiae* Fred Meyer, Inc.

Gile R. Downes, of Schulte, Anderson, DeFrancq, Downes & Carter, P.C., Portland, filed a brief for *amicus curiae* International Council of Shopping Centers, Inc.

Before Carson, Chief Justice, Peterson, Gillette, Van Hoomissen, Fadeley, and Unis, Justices, and Tongue, retired Justice pro tempore.

VAN HOOMISSEN, J.

Fadeley, J., concurred and filed an opinion.

Unis, J., specially concurred and filed an opinion in which Fadeley, J. joined.

Tongue, retired Justice pro tempore, specially concurred and filed an opinion.

Peterson, J., specially concurred in part and dissented in part and filed an opinion.

Gillette, J., dissented and filed an opinion in which Carson, C. J., and Peterson, J., joined.

## VAN HOOMISSEN, J.

■      The state appeals a Court of Appeals decision that reversed defendant's conviction for criminal trespass in the second degree. ORS 164.245. The dispositive issue is whether defendant remained unlawfully on the premises. The Court of Appeals held that defendant established at trial that he was engaged in a constitutionally protected activity and, therefore, the trial court erred in ruling that the order for defendant to leave the premises was lawful. *State v. Dameron*, 101 Or App 237, 238, 789 P2d 707 (1990). Because defendant was convicted at trial, we view the evidence in the light most favorable to the state. *State v. Harris*, 288 Or 703, 721, 609 P2d 798 (1980). We hold as a matter of law that on the record presented in this case no rational trier of fact could have found beyond a reasonable doubt that defendant remained unlawfully on the premises. Accordingly, we affirm the decision of the Court of Appeals on different grounds.

Most of the facts are undisputed. In July 1988, defendant was gathering signatures for an initiative petition on the privately owned sidewalk outside an entrance to a Fred Meyer store. That store is located entirely inside a 16-acre tract of private property in suburban Washington County commonly known as the Raleigh Hills Shopping Center (Center). Defendant was directed to leave the sidewalk by the person in charge of the Fred Meyer store. When he refused to do so, he was arrested for trespassing.

A description of the place where defendant was seeking signatures is necessary to put this case in context.[1] The 16-acre Center property is bordered on the east and west by private property and on the north and south by major arterial streets and public sidewalks. Several privately owned businesses, including both of the Center's automotive service stations, open directly onto or within a few feet of the streets.

---

[1] *See* Appendix, *infra.*

It is not clear from the record whether the "premises" in this case are the entire 16-acre Center or only the Fred Meyer store. The complaint charges that defendant "did unlawfully and knowingly enter and remain in the premises located at 7700 S.W. Hwy 10." The state's evidence focuses on the Fred Meyer store and its adjacent sidewalks and defendant does not appear to argue that that focus is too narrow, *i.e.*, defendant does not argue specifically that the entire 16-acre Center constitutes the "premises."

There are public bus stops on the streets adjacent to the public sidewalks bordering the Center. All entrances to and exits from the Center cross public sidewalks. Access to the major arterial streets bordering the Center on the north and south may be gained by use of several entrances to and exits from the Center, using private roads running through it.

A large, billboard-sized signpost positioned at the north entrance to the Center reads: "FRED MEYER RALEIGH HILLS." The Fred Meyer store, located inside the Center, unquestionably is the Center's anchor store. It is several times larger than any other business in the Center. Fred Meyer advertises its stores to be "one-stop shopping centers." The Fred Meyer store is a very large, free-standing building that is completely surrounded by parking lots that are available for use by anyone visiting the Center for any lawful purpose, *e.g.*, to shop, eat, bank, browse, visit a barber shop, beauty salon, professional offices, day care facility, stroll through the garden center, *etc.* At trial, the state offered no evidence of the specific numbers of the public who gather either at the Fred Meyer store or at the Center. *See Lloyd Corporation v. Whiffen*, 315 Or 500, 512, 849 P2d 446 (1993) (*Whiffen II*) (discussing this point). Fred Meyer security officer McLellan testified that "it is a popular shopping center," but he had "no idea" how many people visited the shopping center on a daily basis.

Several other privately owned businesses, including a golf store, a china, crystal, and silver store, a pizza parlor, and a store that sells telephones, sub-lease space inside the Fred Meyer store (Tenant Building 1). Each of those businesses opens onto the sidewalk outside of the Fred Meyer store where defendant was arrested. People also may enter some of those businesses from inside the Fred Meyer store. At trial, Fred Meyer security officer Philbrick testified that there were "a couple of banks" in the area. It is not clear, however, whether those banks are inside the Fred Meyer store, or outside the store but inside the Center. A public telephone booth is located outside the entrance to the Fred Meyer store.

Located on the same 16-acre Center tract, across a parking lot to the south from the Fred Meyer store, is Fred Meyer's Home Improvement and Garden Center. Patrons and window shoppers wishing to go from the Fred Meyer

store to the Home Improvement and Garden Center naturally and normally use the sidewalk outside the Fred Meyer store to reach the parking lot that they then must cross in order to get to the Home Improvement and Garden Center.

Directly to the east of the Home Improvement and Garden Center is a detached building (Tenant Building 4) that houses several other privately-owned businesses, including a bakery and pastry shop, a womens' clothing store, a nutrition center, a travel agency, a beauty salon, and other retail shops. Patrons and window shoppers who enter those privately owned businesses from the large privately owned parking lot east of the Fred Meyer store or from the public sidewalk adjacent to Southwest Beaverton-Hillsdale Highway naturally and normally use the sidewalk outside the Fred Meyer store.

To the west and southwest of the Fred Meyer store, across parking lots, are several detached buildings (Tenant Building 2, veterinary clinic and day care and professional buildings) that house several more privately owned businesses, including a locksmith, a framing shop, a barber shop, a restaurant, a vacuum cleaner store, a veterinary clinic, a day care center and playground, professional offices, and one of the center's automotive service stations. Patrons and window shoppers who enter those privately owned businesses and professional offices from the Fred Meyer store or from the parking lot to the east of the Fred Meyer store naturally and normally use the sidewalk outside the Fred Meyer store.

To the east of the Fred Meyer store, across a parking lot, are several detached buildings (Tenant Building 3, service station, and bank) that house several more privately owned businesses, including a fabric shop, a printing shop, a ski shop, a video rental shop, a branch of a savings and loan, a branch of a large commercial bank, and a service station. Patrons and window shoppers going from or past the Fred Meyer store to those businesses would naturally and normally use the Fred Meyer sidewalk outside the Fred Meyer store.

At trial, the state contended that defendant had remained unlawfully on Fred Meyer's premises after being lawfully directed to leave by the person in charge. The state

454

argued that defendant had no legal right to ignore the direction from the person in charge of the store that he leave the premises.[2]

Defendant did not dispute that the Fred Meyer store and its adjacent sidewalks are premises open to the public, that the person in charge of the Fred Meyer store directed him to leave, or that he refused to do so. Defendant argued only that he had a constitutional right to remain on the sidewalk outside the Fred Meyer store and, therefore, that he did not remain on the sidewalk unlawfully within the meaning of ORS 164.245(1) and ORS 164.205(3)(b). He relied primarily on Article I, section 8,[3] and Article IV, section 1,[4] of the Oregon Constitution, and the Court of Appeals' decision in *Lloyd Corporation v. Whiffen*, 89 Or App 629, 750 P2d 1157 (1988), and the decisions of the Supreme Court of California and the Supreme Court of the United States in *Robins v. PruneYard Shopping Center*, 23 Cal 3d 899, 153 Cal Rptr

---

[2] The state also argued at trial that defendant had remained on Fred Meyer's premises at a time when there allegedly was a court order in existence restraining people from gathering signatures on Fred Meyer's property. The state's witnesses, however, were vague about the alleged order; they did not know who had been restrained, the scope of the order, what "premises" the order covered, what court had entered the order, or in what county it had been entered. The state did not offer any restraining order in evidence, and the prosecutor told the trial court that he could not even identify the court that allegedly had issued the order. There was no evidence that the alleged restraining order was directed at defendant himself, that he had any personal knowledge of any such order, or that its provisions covered the Fred Meyer Raleigh Hills store. Nothing in the record here remotely suggests that the trial court found defendant guilty because he violated any court order.

[3] Article I, section 8, of the Oregon Constitution, provides:

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

[4] Article IV, section 1, of the Oregon Constitution, provides in part:

"(2)(a) The people reserve to themselves the initiative power, which is to propose laws and amendments to the Constitution and enact or reject them at an election independently of the Legislative Assembly.

"(b) An initiative law may be proposed only by a petition signed by a number of qualified voters equal to six percent of the total number of votes cast for all candidates for Governor at the election at which a Governor was elected for a term of four years next preceding the filing of the petition.

"(c) An initiative amendment to the Constitution may be proposed only by a petition signed by a number of qualified voters equal to eight percent of the total number of votes cast for all candidates for Governor at the election at which a Governor was elected for a term of four years next preceding the filing of the petition."

854, 592 P2d 341 (1979), *aff'd sub nom PruneYard Shopping Center v. Robins*, 447 US 74, 100 S Ct 2035, 64 L Ed 2d 741 (1980).

The trial court found in part:

1. "[D]efendant sought signatures of patrons of Fred Meyer on the sidewalk immediately outside one of the entrances to Fred Meyer within feet of the entrance."

2. "There is no evidence that anyone was dissuaded from shopping at Fred Meyer * * *."[5]

3. "There are also significant factual differences between the place this exercise of speech and petition occurred [than] the ones in [*Lloyd Corporation v.*] *Whiffen*[, *supra*,] and [*PruneYard Shopping Center v.*] *Robins*, [*supra*]. This was not a mall with large common areas, there were no benches, fewer establishments, no gardens or other [non-commercial] facilities that would encourage people to congregate for non-shopping purposes."

The court concluded:

"[T]he state has proven beyond a reasonable doubt that the defendant entered and remained on premises owned by Fred Meyer Inc., on July 6, 1988, in Washington County, after having been asked to leave the premises by a person in charge. The sole issue is whether the defendant was 'lawfully directed' to leave the premises.

"* * * * *

"Defendant had no constitutional right to remain and therefore is guilty of Criminal Trespass II."[6]

On defendant's appeal, the Court of Appeals reversed, explaining:

"This case is not distinguishable from *State v. Cargill*, [100 Or App 336, 786 P2d 208 (1990), *aff'd by an equally divided court*, 316 Or 492, 851 P2d 1141 (1993)].[7]

---

[5] The state made no claim in this case that defendant's conduct interfered with Fred Meyer's commercial enterprise.

[6] In fairness to counsel and the trial court, we note that the judgment in this case was entered before this court's decisions in *Lloyd Corporation v. Whiffen*, 307 Or 674, 773 P2d 1294 (1989) (*Whiffen I*), and *Lloyd Corporation v. Whiffen*, 315 Or 500, 849 P2d 446 (1993) (*Whiffen II*), and the Court of Appeals' decision in *State v. Cargill*, 100 Or App 336, 786 P2d 208 (1990), *aff'd by an equally divided court*, 316 Or 492, 851 P2d 1141 (1993).

[7] *State v. Cargill, supra*, involved signature-gathering at a Fred Meyer store located at 3805 S.E. Hawthorne Boulevard in Portland. Although *Cargill* could be read expansively to apply to every Fred Meyer store in Oregon and, by inference, to

Defendant established that he was engaged in a constitutionally protected activity, and the [trial] court erred in ruling that the order for defendant to leave the premises was lawful." *State v. Dameron, supra,* 101 Or App at 238.

We allowed the state's petition for review.

On review, the state contends that the Court of Appeals erred in holding that the trial court erred in ruling that the order for defendant to leave the premises was lawful. 101 Or App at 238. The state argues that neither Article I, section 8, nor Article IV, section 1, creates a right to collect initiative signatures on private property over the owner's objection.[8] Defendant argues that he had a legal right to ignore the direction to leave the Fred Meyer sidewalk and, therefore, that he was not lawfully directed to leave and, thus, that he did not remain unlawfully on the premises.

ORS 164.245(1) provides:

"A person commits the crime of criminal trespass in the second degree if the person enters or *remains unlawfully* in or upon premises." (Emphasis added.)

ORS 164.205 provides in part:

"As used in ORS 164.205 to 164.270, except as the context requires otherwise:

"* * * * *

"(3) 'Enter or remain unlawfully' means:

"* * * * *

---

every comparable retail store, the Court of Appeals since has made it clear that an expansive reading of *Cargill* was not intended. *See Fred Meyer, Inc. v. McDonald,* 112 Or App 321, 322, 828 P2d 1054 (1992) (each property must be considered on its own facts) *rev den* 316 Or 382 (1993).

[8] The state also argues for the first time in this court that, to the extent that either Article I, section 8, or Article IV, section 1, of the Oregon Constitution, creates any right to use private property for the purpose of signature-gathering for initiative petitions or other speech-related conduct, defendant here exceeded the scope of such right, because he interfered with a customer after she had left Fred Meyer's property and entered the adjacent parking lot. *See Whiffen I, supra,* 307 Or at 687 ("buttonholing" prohibited). The state did not make that argument at trial or on appeal, and we therefore decline to consider it on review. Moreover, nothing in the record remotely suggests that the trial court found defendant guilty because he followed anyone into the parking lot, which was not Fred Meyer's property.

"(b) To fail to leave premises that are open to the public after being *lawfully directed* to do so by the person in charge.

"(4) 'Open to the public' means premises which by their physical nature, function, custom, usage, notice or lack thereof or other circumstances at the time would cause a reasonable person to believe that no permission to enter or remain is required.

"(5) 'Person in charge' means a person, a representative or employee of the person who has lawful control of premises by ownership, tenancy, official position or other legal relationship. * * *

"(6) 'Premises' includes any building and any real property, whether privately or publicly owned." (Emphasis added.)

No *statute* requires that the owner of private premises must provide entry to the premises to other persons for the purpose of gathering signatures on an initiative petition. However, a person may have a legal right to remain on premises after having been directed to leave by the person in charge. *See Whiffen II, supra,* 315 Or at 51 (Article IV, section 1, grants right to gather signatures on initiative petitions in the common areas of large privately owned shopping centers open to the public for commercial purposes); *Lloyd Corporation v. Whiffen,* 307 Or 674, 684, 773 P2d 1294 (1989) (*Whiffen I*) (injunction against trespass at Lloyd Center will not issue if it would cause serious injury to public interest).

■ If a person has a state constitutional right to remain on premises, that right may be raised as a defense to a charge of criminal trespass. In that case, the burden to prove that the order to leave was lawful rests on the state. ORS 161.055.[9]

---

[9] ORS 161.055 provides:

"(1) When a 'defense,' other than an 'affirmative defense' as defined in subsection (2) of this section, is raised at a trial, the state has the burden of disproving the defense beyond a reasonable doubt.

"(2) When a defense, declared to be an 'affirmative defense' by chapter 743, Oregon Laws 1971, is raised at a trial, the defendant has the burden of proving the defense by a preponderance of the evidence.

"(3) The state is not required to negate a defense as defined in subsection (1) of this section unless it is raised by the defendant. 'Raised by the defendant' means either notice in writing to the state before commencement of trial or affirmative evidence by a defense witness in the defendant's case in chief."

The state does not argue that defendant's state constitutional defense is an affirmative defense, or that the defense was not properly raised before trial.

■■ The state must prove every material element of the crime charged beyond a reasonable doubt. ORS 10.095(6); *State v. Rainey*, 298 Or 459, 465, 693 P2d 635 (1985). Beyond a reasonable doubt means that the facts asserted are almost certainly true. *Riley Hill General Contractor v. Tandy Corp.*, 303 Or 390, 402, 787 P2d 595 (1987). *See State v. Williams*, 313 Or 19, 34-42, 828 P2d 1006 (1992) (discussing meaning of reasonable doubt). Thus, if defendant had a legal right to remain on the premises at the time he was directed to leave by the person in charge, he was not lawfully directed to leave within the meaning of ORS 164.245 and 164.205(3)(b) and, therefore, he did not remain unlawfully on the premises.

In *Whiffen I, supra*, 307 Or at 680, an action for an injunction against the defendants for unreasonably interfering with the plaintiff's use of its private property, this court concluded on a subconstitutional level that the defendants in that case had a right to petition on the plaintiff's property subject to reasonable time, place, and manner restrictions. In *Whiffen I*, the premises were described as "a privately owned shopping center open to the public for commercial purposes." *Id.* at 677. In *Whiffen I*, this court noted that that case did not present a simple private nuisance or trespass issue but, rather, a situation in which a public interest was at stake. While the public interest in allowing the collection of signatures for ballot measures, under Article IV, section 1, of the Oregon Constitution, does not create an unqualified right to enter a privately owned shopping center open to the public for commercial purposes to gather signatures, neither is such activity entirely barred on all private premises. *Id.*

In *Whiffen* I, this court held that, because the nature of the Lloyd Center was the antithesis of a private place and because of the large number of the public who gathered there, to exclude persons engaged in signature-gathering activity would not serve the public interest. *Id.* at 685. This court held that the signature-gathers "cannot be enjoined from entering the Center to express their opinion, so long as they do so reasonably and without interfering with plaintiff's commercial enterprise." *Id.* at 687. "Clearly they can if they do so reasonably, quietly, and peaceably." *Id.* Under the facts presented in *Whiffen I*, however, the court noted that some of the signature-gathering activities did interfere with commercial

enterprise and, therefore, *that intrusive activity* could be enjoined. *Id.*

In *Whiffen II, supra,* 315 Or at 515, this court held that "persons seeking signatures on initiative petitions in the common areas of the Lloyd Center have a constitutional right to do so under Article IV, section 1, of the Oregon Constitution, subject to reasonable time, place, and manner restrictions." This case does not involve reasonable time, place, and manner restrictions. Indeed, Fred Meyer, Inc., claims an absolute right to prohibit anyone from seeking initiative petition signatures on its property. At trial, the state argued only that defendant had no right whatsoever to remain on Fred Meyer's private property.

In *Whiffen II,* the premises where people could exercise their Article IV, section 1, rights to gather signatures on initiative petitions were described as "large shopping center[s], such as the Lloyd Center." 315 Or at 503. *See Clackamas Town Center Assoc. v. Wolf,* 315 Or 557, 560, 849 P2d 477 (1993) (same). In *Whiffen II,* this court concluded that "access to people is the life blood of the initiative power" and that some minimal intrusion on the rights of the mall owner is justified in view of the importance of the power of initiative reserved to the people. *Id.* at 511. This court held that *where* persons may seek signatures on initiative petitions is essential to the purposes of Article IV, section 1, of the Oregon Constitution, and is of vital importance in making effective the purpose of Article IV, section 1. *Id.* at 511-12. We agreed with the following language in the Court of Appeals opinion in *State v. Cargill, supra:*

> "It is implicit in Article IV, section 1, that the people must have adequate opportunities to sign the [initiative] petitions that are necessary for them to act as legislators." 100 Or App at 343.

In *Whiffen II,* this court interpreted Article IV, section 1, liberally in favor of the peoples' right peaceably to gather signatures for initiative petitions. This court then held:

> "[T]o prohibit the gathering of signatures on initiative petitions in the common areas of large shopping centers such as the Lloyd Center would 'impinge on constitutional rights' conferred on the citizens of this state by the provisions of

Article IV, section 1, of the Oregon Constitution. Such rights, however, are subject to reasonable time, place, and manner restrictions * * *." *Whiffen II*, 315 Or at 514.

In *State ex rel Gladden v. Lonergan*, 201 Or 163, 177, 269 P2d 491 (1954) quoting 11 Am Jur 704, Constitutional Law, this court stated:

"It is a fundamental canon of construction that a Constitution should receive *a liberal interpretation in favor of a citizen*, especially with respect to those provisions which were designed to safeguard the liberty and security of the citizen in regard to both person and property." (Emphasis added.)

During oral argument in this court, the state's appellate counsel stated: "This case arises on a very meager record." We agree. Although the parties in this case refer to evidence in other cases involving different Fred Meyer stores, we emphasize that this case involves only the Fred Meyer store that is located within the Raleigh Hills Shopping Center. Our analysis here is based solely on the record in this case.

■ In most cases, the state would meet its burden to prove that the defendant remained unlawfully on private property by showing that the defendant failed to leave the premises that are open to the public after being directed to do so by the person in charge. ORS 164.205(3)(b). However, ORS 164.245(1) also requires the state to prove beyond a reasonable doubt that the defendant remained unlawfully on the premises. The legal authority of a person in charge of a large privately owned shopping center open to the public for commercial purposes to direct a person to leave the premises, however, does not necessarily determine whether the person directed to leave was lawfully directed to do so. ORS 164.205(3)(b). In other words, in a criminal prosecution under ORS 164.245, the state must prove, not only that the person in charge directed the defendant to leave the premises, *but also* that the direction to leave the premises was lawful, *i.e.*, that the defendant had no legal right to ignore the direction to leave. *See* ORS 161.055(1) ("When a 'defense,' other than an 'affirmative defense' as defined in subsection (2) of this section, is raised at trial, the state has the burden of disproving the defense beyond a reasonable doubt").

■ The trial court found in part:

"There are also significant factual differences between the place this exercise of speech and petition occurred [than] the ones in *Whiffen* and *Robins, supra.* This was not a mall with large common areas, there were no benches, fewer establishments, no gardens or other [non-commercial] facilities that would encourage people to congregate for non-shopping purposes."[10]

Although there are some differences between the premises here and those in *Whiffen I* and *Robins*, the sum total of the evidence in this case presents a picture of premises that are not materially different from those involved in *Whiffen I* and *Robins*.[11] The premises here are a large privately owned shopping center open to the public for commercial purposes. *Whiffen I, supra*, 307 Or at 677. Moreover, the state offered no evidence about the numbers of the public who gather at the Fred Meyer store or at the Center, other than the observation of a Fred Meyer security officer that "it is a popular shopping center."

■ We conclude that the mere fact that there may be some differences between the large privately owned shopping centers open to the public for commercial purposes in *Whiffen II* and *Clackamas Town Center* and the large privately owned shopping center open to the public for commercial purposes in this case, is not dispositive of defendant's state constitutional defense here. Rather, it was incumbent on the state to prove beyond a reasonable doubt at trial that the Fred Meyer

---

[10] For example, the trial court found that "there were no benches" for the public to use. The testimony of Fred Meyer's security officers, however, shows that benches had been provided in the past, but that the benches were removed because they were being monopolized by "transients."

The question whether a large privately owned shopping center open to the public for commercial purposes is the kind of premises where petitioning activity is protected under Article IV, section 1, is not answered by counting the number of "gardens, flower beds, statuary, murals, various other works of art, benches, escalators, stairways and bridges, * * * directories and information booths" in the shopping center. *See Whiffen II, supra*, 315 Or at 530 (Gillette, J., dissenting). Moreover, it is common that shopping centers have "walkways that are bordered by storefronts." *Id.* at 529-30. Rather, it is clear from *Whiffen II* that the focus of any inquiry must be directed on whether a shopping center open to the public for commercial purposes is "large," and whether "large numbers of people" gather there. *Id.* at 512.

[11] The exhibits received in evidence include 11 photographs of the Fred Meyer store and the Center, and 2 large diagrams of those properties.

"one-stop shopping center" within the Center in this case was *not* analogous to the shopping center in *Whiffen*. *See* ORS 161.055 (burden of disproving defense beyond a reasonable doubt rests on the state). This the state utterly failed to do and, as noted, *supra* note 1, it is not even clear from the record what premises the parties and the court thought were the subject of this prosecution.

On this record, we do not believe that a rational trier of fact could have found beyond any reasonable doubt that the state proved that the subject premises here, whatever those premises may be, were not a large privately owned shopping center open to the public for commercial purposes where defendant had a right under Article IV, section 1, to peaceably seek petition signatures. It follows, therefore, as a matter of law that the state failed to prove beyond a reasonable doubt that defendant was "lawfully directed" to leave or that he "remained unlawfully" on the premises.

Because we decide this case on a narrow and sub-constitutional ground, it is not necessary for this court to draw the line for all time and for all future cases involving claims of constitutional rights to seek signatures on initiative petitions on private property. Rather, it is sufficient for us to conclude here that the state failed to prove that it is "almost certainly true," *Riley Hill General Contractor v. Tandy Corp., supra*, 303 Or at 402, that defendant was "lawfully directed" to leave the premises and, therefore, that he "remained unlawfully" on the premises within the meaning of ORS 164.245(1) and 164.205(3)(b). We hold as a matter of law that on the record presented in this case no rational trier of fact could have found beyond a reasonable doubt that defendant remained unlawfully on the premises. Accordingly, we reverse defendant's conviction for failure of proof and we affirm the decision of the Court of Appeals on different grounds.

■ The dissent argues that there is no state constitutional right to gather petition signatures on private property. The dissent is wrong. *Whiffen II, supra*; *Clackamas Town Center Assoc. v. Wolf, supra*.

The decision of the Court of Appeals is affirmed on different grounds. The judgment of the district court is reversed.

# STATE'S EXHIBIT 1
## APPENDIX

**FADELEY, J.,** concurring.

Arrested on a sidewalk while discussing proposed legislation, defendant appeals his subsequent conviction for criminal trespass. Defendant contends that, given his occupation at the time, he was not on the sidewalk "unlawfully." Defendant was seeking signatures on an initiative petition proposing that a new law be adopted by the voters of the state. The sidewalk was used in common by customers and visitors to a department store and various other businesses arrayed along the sides of a parking lot, but was privately owned property. An employee of the store caused defendant's arrest after defendant attempted to speak to an individual who had left the store and was on her way to her automobile parked in a lot on the other side of the sidewalk.

I concur with the lead opinion and, as to the outdoor sidewalk in the shopping center described in the lead opinion, I also concur in the concurring opinion of Unis, J. The order to leave these premises open to the public was neither lawful nor proved to be. Neither of those opinions discuss the dissent or the exhortation of Retired Justice Tongue (serving pro tempore in this case) to avoid the pitfalls of delays that he found present when he served between 1969 and 1982. I will discuss both, starting with the dissent.

I

The dissent asserts that signature-gathering activity never "*could be* * * * constitutionally protected." 316 Or at 491 (emphasis in original). Rejecting applicability of two Oregon constitutional guarantees — free speech in political matters such as voter initiatives and the right to propose legislation by the initiative[1] — the dissent flatly states: "there is no such constitutional right to gather petition signatures on private property." 316 Or at 491 (Gillette, J., dissenting).

---

[1] Article I, section 8, provides in part:

"No law shall be passed restraining the free expression of opinion * * * on any subject whatever * * *."

Article IV, section 2, provides in part:

"The people reserve to themselves the initiative power, which is to propose laws and amendments to the Constitution and enact or reject them independently of the Legislative Assembly. * * * An initiative * * * may be proposed only by a petition signed by the [required] number of qualified voters."

Under that restrictive view, state criminal law may be used governmentally to thwart both speech and the initiative.

That position *seems* to make absolute inviolability of "private property" the touchstone for deciding this criminal trespass/initiative petition case. I certainly agree that private property rights are of constitutional magnitude, even though no constitutional text regarding property rights can be cited to diminish or condition rights of free speech and of initiating legislation, let alone abrogating them. Inconsistently, as it seems, the dissenters have joined in numerous decisions over a number of years that uphold substantial restrictions on private property rights in the form of land-use laws. For example, state regulation (state action) frequently requires a commercial developer to provide substantial off-street parking as a condition of development to avoid the need for publicly created parking. This governmental exaction substitutes for parking and walkways that otherwise would have been on the public street, *i.e.*, substitutes for a public place. And in the area of speech, a door-to-door peddler's rights to intrude into private property were upheld in *Hillsboro v. Purcell*, 306 Or 547, 761 P2d 510 (1988), as was a business solicitation in *Moser v. Frohnmayer*, 315 Or 372, 845 P2d 1284 (1993). In the latter case, the invasion was accomplished by an automatic dialing device and a recorded message, rather than by a live person.[2]

The dissent's reasoning also would abrogate the provisions of the criminal trespass law itself.[3] That law, since 1971, has plainly recognized a separate kind of private property "open to the public." ORS 164.205(3) and (4), enacted in Oregon Laws 1971, chapter 743, section 135, recognize that specific sort of privately owned property and place limitations on directions to leave such property, requiring that the direction be a lawful one. *Former* ORS 164.460 (1969) (repealed

---

[2] *See also Cincinnati v. Discovery Network*, ____ US ____, 113 S Ct 1505, 123 L Ed 2d 99 (1993) (ban on sidewalk newsracks for commercial publications only held, *inter alia*, not content neutral and therefore to offend First Amendment). That case may answer a contention that Fred Meyer's freedom of speech is abridged unless it can exercise *content* control over speech on its premises.

[3] Nor, should they be able to, after this court held in *Lloyd Corporation v. Whiffen*, 307 Or 674, 773 P2d 1294 (1989) (*Whiffen I*), that the power of the state courts should not be used, through injunctions, to quell initiative speech exercised at a reasonable time, place, and manner.

and replaced by the 1971 act) did not mention private property open to the public. *But see Lenrich Associates v. Heyda*, 264 Or 122, 135-36, 504 P2d 112 (1972) (O'Connell, C. J., dissenting) ("I would affirm * * * on the ground that the mall area in this case is essentially a public place and that the defendants are entitled to the protection of Art. I, § 8 of the Oregon Constitution").

The dissent would permit criminal sanctions to enforce shrinking of the two constitutional guarantees. As to speech, the dissent requires state action before there is *any* constitutional protection, but refuses to see state action in a criminal prosecution by the district attorney in the name of the state. Likewise, other state actions involved in creating shopping centers as privatized community gathering places are ignored.[4]

I would not allow that state criminal law to abrogate either speech or initiative in those circumstances. A Fred Meyer employee testified in *State v. Cargill*, 316 Or 492, 851 P2d 1141 (1993), that the corporation permitted initiative petitioning near its parking lots for a number of years but later prohibited it. During the time that the corporation permitted petitioning, reasonable time, place, and manner conditions were in place. There is no substantial business reason in the record why that accommodation is not available now. State criminal laws should not be employed before reasonable time, place, and manner conditions are tried and have failed.

The trial court in *Cargill* found as fact that:

"It is also quite clear, I think, and undisputed, that if they [petition signature gatherers] are not allowed to seek petitions at stores like Fred Meyer's, and Fred Meyer [is] the biggest community presence we have here in the state, a lot of petitions, initiative petitions, are not going to make it on the ballot * * *."

---

[4] Favorable governmental land use decisions and regulations, government-provided or government-assisted developmental financing, government accommodations through road and highway changes, and government transfers of streets and roads from public to private use are other examples of governmental action involved. For example, in the companion case, *State v. Cargill*, 316 Or 492, 851 P2d 1141 (1993), decided by six members of the court, Madison Street was changed from a public street to benefit the access and parking lot at the 39th and Hawthorne, Portland, Fred Meyer department store.

Fred Meyer is this state's largest private employer. Its "community presence" is statewide. The kind of voters interested in legislation affecting a majority of Oregonians is the kind of voters who shop at Fred Meyer. Access to those voters, on an efficient basis, is necessary if the initiative process is to work properly in this state.

## II

Retired Justice Tongue, appointed pro tempore in this case and in *Lloyd Corporation v. Whiffen*, 315 Or 500, 849 P2d 446 (1993) (*Whiffen II*), should be acknowledged by every member of the legal community, and the public, for his unflagging devotion to reduction in delay in the appellate systems.

This is the seventh time during his professional career that Justice Tongue has published criticisms of this sort aimed at the Oregon Supreme Court.[5] Indeed, much of what he writes today seems to be lifted word-for-word from *State v. Quinn*, 290 Or 383, 409-22, 623 P2d 630 (1981) (Tongue, J., specially concurring).

Justice Tongue's criticism is directed toward the past, not the possibility for the future that this court is in action to achieve.[6] As Justice Tongue recognizes today, things are better here at present than they were when he wrote in *Quinn* after he had been on the court for over ten years. That is no surprise and results from the current court's commitment to clear the docket, responsibly, on a two and one-half year plan that is to end, successfully, this coming September.[7]

Writing 12 years ago, Justice Tongue said in *Quinn*:

"I find myself both frustrated and saddened by the failure of this court to take effective action toward a solution of what

---

[5] There may be other times when he was Chair of the Judicial Administration Committee of the Bar. Judge-bashing goes with that territory.

[6] Indeed, the specific figures used by Justice Tongue will not be an accurate picture of pending cases at all as this is published in the advance sheets. They will instead be like statues of historical villains in a wax museum.

[7] The 23 death penalty cases pending when the plan was instituted, where the law mandates an automatic review by this court of all trial court death sentences, were then becoming time consuming. Many of those cases had to be dealt with by this court in two separate appeals, with an appeal not infrequently having 50 or more assigned errors.

has become a problem of such a magnitude as to result in what I believe to be a partial paralysis of the effective functioning of this court as a court of justice in the sense that 'justice delayed is justice denied.' " *Id.* at 417.

Justice Tongue there suggested that the court

"could require individual appellate judges to at least write proposed opinions on cases assigned to them within 90 days." *Id.* at 416.

This court employs that rule and is currently ahead of that game. At the opinion conference on May 11, five of the six cases voted to be released for publication were *argued* much less than 90 days earlier, including two argued the first week of May. The sixth was voted for release on a draft completed less than 60 days previously.

Indeed, to members of this court, it seems that we have been running a marathon, have overcome hitting "the wall" that distance runners experience, and are in sight of the finish line and the spectators seated at the finish line. As we approach, victory in our sight, one of them stands and delivers a pie-in-the-face to the lead runners, as it seems.

The standard to which Justice Tongue would hold this, and any appellate court, was enunciated by a commission reporting to the American Bar Association in 1977. By its terms, it is directed to courts that operate in *panels*, not to courts such as this state supreme court,[8] but the point made in 1977 is nonetheless a good guide.

Talking about this case, *State v. Dameron*, Justice Tongue says: "After mostly unnecessary delays for 13 months, it was reassigned on April 7, 1993, to Justice Van Hoomissen." 316 Or at 487. The Justice is too modest. After first being assigned, along with *Whiffen II, supra*, to one of the dissenting members herein, this case (*Dameron*) was

---

[8] In a collegial court such as this one, operating *en banc* and by all justices contributing to the opinion, not just the named author, we must come together on the reasoning of the decision. At times that is a bit like participating in a seven-legged sack race where all participants, each with one leg in the same sack, must cross the finish line together. Of course, this produces what Karl Llewellyn, excerpted in Aldisert, The Judicial Process 675, 681 (1976), called the steadying factor of group decision.

reassigned to Justice Tongue for a little while before it was a reassigned a second time to Justice Van Hoomissen.[9]

Another criterion of delay discussed by Justice Tongue in *Quinn* is the elapsed time between the date when the last brief is filed, or the case is otherwise at issue, and the date when the case receives a hearing such as oral argument. He also wrote about that criterion in his 1957 law review article about delay on the Oregon Supreme Court. He said:

> "[T]he over-all average elapsed time between the filing of the last brief and the hearing of the case is approximately one year." Tongue, *Delays on Appeals to the Oregon Supreme Court*, 36 Or Law Rev 253, 255 (1957).

However, as to *civil* cases, the average elapsed time between filing the last brief and oral argument date, as reported by then-lawyer Tongue, was one and one-half years. *Ibid.*

That criterion — time from at issue on appeal until oral argument — is not dealt with by Justice Tongue today, perhaps because this court is in exemplary condition on that criterion. Cases heard in May (this month) were on petitions for review, a direct appeal, and an original mandamus, all allowed or noticed this calendar year.[10] Five of the cases heard this month were allowed the middle of March, and one was at issue only two days before its hearing. Of the 26 cases before the court with no draft opinions written (as of May 25, 1993), 19 were heard three weeks earlier, and the remainder, less two, were heard the first week in March.

In *Quinn* in 1981, Justice Tongue chose to quote a 1958 Legislative Interim Committee report, as follows:

> " 'The primary function of the court is to decide cases. The function of exploring and synthesizing the law, while at times helpful, is * * * an incidental one.' " 290 Or at 419-20.

That report thus argues that "get it done" is more important than "get it right," a view that still has its adherents. I am not one of them, given that one major purpose of our opinions

---

[9] Neither *Dameron* nor *State v. Cargill*, 316 Or 492, 851 P2d 1141 (1993), nor *Lloyd Corporation v. Whiffen*, 315 Or 500, 849 P2d 446 (1993) (*Whiffen II*), have ever been assigned to me. My *mea culpas* are in other areas. I unsuccessfully urged that *Dameron* stay with Justice Tongue a bit longer before its second reassignment. He suggested the reassignment.

[10] One case was reset from November 1992 *at the request of the parties.*

should be to provide practitioners a reasonable opportunity to predict the outcome of other cases by applying to them the law announced in the current case.[11] Predictability, of course, requires solid reasoning, adhered to by all or a clear majority of justices and, perhaps, by a habit of adherence to *stare decisis*.

Because Justice Tongue's seventh criticism of the court looks to the past, and not to the future (nor even the complete current situation as this is published), it is not totally accurate.[12] That is of small moment, because the marathoners are about to cross the finish line. And his seventh try will be the charm, it is already clear.

**UNIS, J.**, specially concurring.

Defendant was gathering signatures on an initiative petition while standing on the sidewalk (near the main entrance) of the Fred Meyer store, a large privately-owned "one-stop shopping center" open to the public for commercial

---

[11] Dean Wigmore, excerpted in Leflar, Appellate Judicial Opinions 151 (ed 1974), seems to criticize the "get-it-done" school when he discusses one of the shortcomings of appellate opinions as follows:

"In the next place, the *overburdening labor* cramps them. The number of appeals, and the popular demand for quick dispatch, unite to make a pressure for hurry. This means that there is no time to study and master 'ad hoc' the whole law of a subject. There is only time to master the record of the specific case, and for this purpose to peruse the precedents cited on the brief, or some of them." (Emphasis in original.)

[12] Justice Tongue says, 316 Or at 488, that:

"This court * * * hears mostly cases which it chooses to hear by the granting of petitions for review of decisions by the Court of Appeals."

There are other classes of time-consuming cases that this court must take, having no choice in the matter. "Automatic" death penalty cases come by direct appeal, frequently involving 50 or more assignments of error per case. The 23 death penalty cases with automatic appeals a few years back placed the court in need of running this marathon, in the view of many people. Direct, statutorily permitted appeals come from the Oregon Tax Court. Direct proceedings to review legal sufficiency of ballot titles, explanatory statements, and procedural matters related to elections, constitute a not inconsiderable amount of priority litigation (one of which is decided today, less than 30 days after the election case first arose). Cases sent by special law for constitutional review in this court directly, from legislative enactment to this court, such as pension-taxation or corrections construction siting, and bond financing also consume chunks of priority time. Original jurisdiction requests in habeas corpus and mandamus as to which this court is the first stop, continue unabated.

Moreover, the number of petitions for review has increased by a significant percentage in recent years. So, it seems, have the number of matters statutorily subject to expedited or priority handling.

purposes and located within the 16-acre Raleigh Hills Shopping Center. He was asked to leave by an employee of the store and, when defendant refused, he was arrested for criminal trespass in the second degree. ORS 164.245(1). Defendant raised the defense that he had a constitutional right under Article IV, section 1, of the Oregon Constitution to stand on the sidewalk for the purpose of collecting signatures on an initiative petition and that, therefore, the order for him to leave was not lawful.[1]

In my opinion, the Fred Meyer "one-stop shopping center" located within the Raleigh Hills Shopping Center is sufficiently analogous to the Lloyd Center in *Lloyd Corporation v. Whiffen*, 315 Or 500, 849 P2d 446 (1993) (*Whiffen II*), and to the Clackamas Town Center in *Clackamas Town Center Assoc. v. Wolf*, 315 Or 557, 849 P2d 477 (1993),[2] for the purpose of determining defendant's right to gather signatures on an initiative petition under Article IV, section 1. In *Whiffen II, supra*, this court held that "persons seeking signatures on initiative petitions in the common areas of the Lloyd Center have a constitutional right to do so under Article IV, section 1, of the Oregon Constitution, subject to reasonable time, place, and manner restrictions," 315 Or at 503, based in part on this court's previous holding in *Lloyd Corporation v. Whiffen*, 307 Or 674, 773 P2d 1294 (1989) (*Whiffen I*), that " 'the process of gathering signatures is substantially impaired' if signature gatherers are not permitted to gather signatures in the common areas of large shopping malls such as the Lloyd Center." *Whiffen II, supra*, 315 Or at 512 (referring to holding in *Whiffen I, supra*).

Based on this court's holding in *Whiffen II*, I believe that defendant was engaged in a constitutionally-protected activity and that the trial court erred in ruling that the order for defendant to leave the premises was lawful.

Fadeley, J., joins in this opinion.

---

[1] Defendant also claimed that the order for him to leave was not lawful under Article I, section 8, of the Oregon Constitution.

[2] A detailed description of both the place where defendant was seeking signatures and the 16-acre Raleigh Hills Shopping Center is set forth in Justice Van Hoomissen's opinion. *See* 316 Or at 451-53 and Appendix.

**TONGUE, retired Justice pro tempore,** specially concurring.

I concur in the opinion by Justice Van Hoomissen and agree with his conclusion that the state did not sustain its burden of proof that the order to defendant to leave the sidewalk in front of the Fred Meyer store was a "lawful order."

I write this specially concurring opinion for three reasons: (1) to state reasons why, in my opinion, the evidence was sufficient to prove affirmatively that defendant had the right under Article IV, section 1, to seek signatures on initiative petitions while standing on the sidewalk of the Fred Meyer store near its entrance; (2) to state reasons why, in my opinion, in addition to defendant's rights under Article IV, section 1, to solicit signatures on initiative petitions, he also had the right to do so under Article I, section 8 (free speech); and (3) to express my concern over the long delays by this court in its decision of this and other cases.

## I. ARTICLE IV, SECTION 1 — INITIATIVE AND REFERENDUM

In *Lloyd Corporation v. Whiffen*, 315 Or 500, 510, 849 P2d 446 (1993) (*Whiffen II*), this court approved the following statement by the United States Supreme Court in *Marsh v. Alabama*, 326 US 501, 506, 66 S Ct 276, 90 L Ed 265 (1946):

> " 'The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it.' "

Although that statement is not binding on this court in the interpretation of the Oregon Constitution, this court nevertheless agreed with that rule.[1]

---

[1] The dissenting opinion in *Lloyd Corporation v. Whiffen*, 315 Or 500, 555, 849 P2d 446 (1993) (*Whiffen II*), refuses to agree with this widely-recognized rule, as made clear by its statement that:

"It is not enough to justify applying constitutional limitations to the use of private property simply by arguing that the private property is a popular meeting place to which the public is invited. If that were enough, private property owners would, in effect, be penalized for their entrepreneurial success

To the same effect, the California Supreme Court in *Robins v. PruneYard Shopping Center*, 153 Cal Rptr 854, 592 P2d 341, 346 (1979), *aff'd* 447 US 74 (1980), held, quoting from previous cases, that "[all] private property is held subject to the power of the government to regulate its use for the public welfare," 592 P2d at 344, that "where the interest of the individual conflicts with the interests of society, such individual interest is subordinated to the general welfare," *id.* at 345, and that "the public interest in peaceful speech outweighs the desires of property owners for control over their property," *id.* at 347, but that in such cases the owners of private property are entitled to adopt "reasonable regulations * * * to assure that those activities do not interfere with normal business operations use," *id.* at 347.

In *Whiffen II, supra*, 315 Or at 512, this court held that it is implicit in Article IV, section 1, of the Oregon Constitution that the people must have adequate opportunity to seek signers on initiative petitions and that this includes the right, subject to reasonable time, place, and manner restrictions, to seek such signatures in the common areas of large shopping centers, because the malls of such shopping centers are "public places" and are "the antithesis of a private place." This court also previously held in *Lloyd Corporation v. Whiffen*, 307 Or 674, 687, 773 P2d 1294 (1989) (*Whiffen I*), that peaceful solicitation of signatures on initiative petitions in the common areas of a large shopping center does not, in and of itself, constitute substantial interference with the center's activity.

A. *The Sidewalks of a Large "One-Stop Shopping Center"*

In considering a case involving persons seeking to exercise their right to seek signatures on initiative petitions on privately-owned property to which the public has been invited and the reasonableness of time, place, and manner restrictions upon their rights to do so, the private property

---

in putting their property to a business use that attracts many customers. The Oregon Constitution should not now be rewritten to punish successful private entrepreneurship."

The dissenting opinion in this case, by its reference to that dissent, adopts the same position. This is the fundamental difference between the majority and the dissent in that case and also in this case.

involved in such a case may range from a small "mom and pop" grocery store to areas near stores in a company town.

Even for a small "mom and pop" grocery store, it would clearly be both unlawful and unreasonable for the owner to adopt and post a rule stating that any person entering the store wearing a shirt with a political slogan would be asked to leave, and if that person refused to leave he would be arrested for criminal trespass. On the other hand, it would not appear to be either unlawful or unreasonable for the owner of such a store to adopt a rule forbidding persons seeking signatures on initiative petitions to *enter inside the store* to do so. Such persons could do so, however, while standing on the *public sidewalk* outside and near the entrance to the store.

At the other extreme, for the owner of a company town with privately-owned streets and sidewalks to adopt and enforce a rule prohibiting persons from exercising their right of free speech by seeking signatures on initiative petitions on such *privately-owned sidewalks* near the entrances of stores bordering such sidewalks or streets would be unlawful, as held in *Marsh v. Alabama, supra.* But, again, it would appear not to be either unlawful or unreasonable for the owner of a company town to adopt and enforce a rule prohibiting solicitation of signatures on initiative petitions *inside* stores bordered by such sidewalks and streets.

In between these two extremes are at least two types or categories of private property with retail stores to which the public is invited: (1) large shopping centers such as the Lloyd Center, which have common areas and wide malls that are similar in function to public *sidewalks*; and (2) large downtown department stores and their modern counterpart — large suburban "one-stop shopping centers," which do not have malls or common areas, but which offer a variety of items for sale comparable to large downtown department stores, and which commonly have large privately-owned parking lots and privately-owned *sidewalks* for use by customers in going from their cars to the entrances of such stores.

Although all Fred Meyer stores are not the same, according to a brief in this case, it is a matter of common

knowledge that Fred Meyer advertises that its stores provide "one-stop shopping centers." In any event, it appears from the record in this case that this Fred Meyer store is a large suburban "one-stop shopping center" with a large parking lot and a *sidewalk* that its potential customers are invited to use in going to and from entrances to the store.

As previously noted, in *Whiffen II, supra*, this court held that, under Article IV, section 1, of the Oregon Constitution, persons have the right to seek signatures on initiative petitions *inside* large shopping centers (the first of these two categories) at designated areas on the malls (sidewalks) inside such shopping centers, but not inside the stores bordering such walkways.

This case involves the second of the two categories, a large suburban "one-stop shopping center," without inside malls, but with outside sidewalks.

Defendant did not assert the right to go *inside* the Fred Meyer store to seek signatures on initiative petitions, but contends that he had the right to do so while standing on the *sidewalk* near its entrance, a far less "intrusive" invasion of private property. Defendant contends that his right to do so was violated when, at the request of the store, he was arrested for criminal trespass. His arrest was the enforcement, by use of the criminal trespass statute, ORS 164.295, of a rule adopted by the owner of the store that persons would not be permitted to solicit signatures on initiative petitions on any part of its privately-owned property.

For these reasons, it is my opinion that the rule adopted by Fred Meyer forbidding the solicitation of signatures on initiative petitions on any part of its property was not only an unreasonable rule, but a rule that, when enforced by the arrest of defendant for criminal trespass, violated his rights under Article IV, section 1, of the Oregon Constitution. It would be a reasonable time, place, and manner restriction for Fred Meyer to designate areas near the entrances to its store for use by persons seeking signatures on initiative petitions, as in *Whiffen II, supra*, in which persons seeking signatures on initiative petitions were permitted to do so in designated areas in the malls of the Lloyd Center, but the rule adopted by Fred Meyer is not such a reasonable rule.

For these same reasons, it is my opinion that the exterior *sidewalk* of a large "one-stop shopping center" is a public place of such a nature that defendant had a constitutional right under Article IV, section 1, to seek signatures on initiative petitions while standing on such a sidewalk. Indeed, this conclusion is implicit in the opinion by Justice Van Hoomissen.

It follows that the order by the "person in charge" of this Fred Meyer property directing defendant to stop that activity and to leave those "premises" was not a "lawful order."

In this case, it is not necessary to attempt to adopt rules or "tests" by which this court can properly determine the outcome of all future cases in which persons claim the right to seek signatures on initiative petitions on private property to which the public has been invited by its owner. Just as courts make no attempt to adopt rules defining what is a "reasonable search and seizure," but decide such cases on a "case-by-case" basis, so also, in my opinion, cases in which persons claim a right to seek signatures on initiative petitions on private property open to the public likewise must be decided on a "case-by-case" basis.

In the event, however, that this court should desire to state and adopt rules or "tests" for application in such future cases, the same result as previously stated would follow in this case by adoption of the tests adopted by the New Jersey Supreme Court in *State v. Schmid*, 84 NJ 582, 423 A2d 615 (1980).

B.  *The New Jersey Tests*

In the adoption of tests to determine when property interests must accommodate the exercise of constitutional rights by persons invited on private property, the New Jersey court proceeded from the same premise as stated in *Marsh v. Alabama, supra* (that the more the owner of private property opens the property for public use, the more the owner's rights are limited by the constitutional rights of those who use it, 423 A2d at 629), as did this court in *Whiffen II, supra.* The New Jersey court then held that:

"Since it is our State Constitution which we are here expounding, it is also fitting that we look to our own strong

traditions which prize the exercise of individual rights and stress the societal obligations that are concomitant to a public enjoyment of private property. See *Vasquez v. Glassboro Service Ass'n, supra,* 83 N.J. at 100-101, 415 A.2d 1156; *State v. Shack, supra,* 58 N.J. at 305-308, 277 A.2d 369; *Zelenka v. Benevolent & Protective Order of Elks, supra,* 129 N.J. Super. at 386-387, 324 A.2d 35.

"Accordingly, we now hold that under the State Constitution, the test to be applied to ascertain the parameters of the rights of speech and assembly upon privately-owned property and the extent to which such property reasonably can be restricted to accommodate these rights involves several elements. This standard must take into account (1) the nature, purposes, and primary use of such private property, generally, its 'normal' use, (2) the extent and nature of the public's invitation to use that property, and (3) the purpose of the expressional activity undertaken upon such property in relation to both the private and public use of the property. This is a multi-faceted test which must be applied to ascertain whether in a given case owners of private property may be required to permit, subject to suitable restrictions, the reasonable exercise by individuals of the constitutional freedoms of speech and assembly." *State v. Schmid, supra,* 423 A2d at 629-30.

In this case, the "primary" and "normal" use of this property is as a large retail "one-stop shopping center" store, selling a wide assortment of goods. The extent and nature of the public's invitation is to come upon that property and into that store to purchase goods there offered for sale, and the purpose of the "expressional activity" undertaken on such property is the solicitation of signatures on initiative petitions, a constitutionally-protected activity.

Upon consideration and application of the New Jersey test to the evidence in this case, I would find that the sidewalk of this Fred Meyer store is a place where constitutional rights to gather signatures on initiative petitions may be exercised. Further, I would find that the gathering of such signatures on the sidewalk near the entrance to this Fred Meyer "one-stop shopping center" would not substantially interfere with its operation and that the rule adopted by Fred Meyer absolutely barring the solicitation of signatures on initiative petitions on any part of its property was not a reasonable time, place, and manner restriction.

There is no evidence of interference. The conduct of this defendant in seeking signatures on initiative petitions while standing on the sidewalk near, but not blocking, an entrance to this Fred Meyer store did not interfere in any substantial way with the business of the store. In *Whiffen I, supra*, 307 Or at 687, this court held that "[t]he solicitation of patrons does not in and of itself constitute substantial interference." In *Whiffen II, supra*, this court held, in effect, that the rules adopted by the Lloyd Center may restrict initiative signature gathering only to the extent that such activity substantially interferes with its commercial enterprise.

It follows, in my opinion, that upon application of the New Jersey tests defendant had the right under Article IV, section 1, of the Oregon Constitution to seek signatures on initiative petitions while standing on the sidewalk near the entrance to this Fred Meyer store.

For the same reasons, it is my opinion that the direction given to defendant to leave the Fred Meyer property was not a "lawful" direction under ORS 164.205(3)(b), because it violated his constitutional rights under Article IV, section 1, of the Oregon Constitution.

This is not the first case in which a state court has permitted the exercise of a constitutionally protected right on a privately-owned sidewalk of a large retail store. In *Robins v. PruneYard Shopping Center, supra*, 592 P2d at 346, the California Supreme Court quoted with approval the following statement by it in its previous decision in *In re Lane*, 71 Cal 2d 872, 79 Cal Rptr 729, 457 P2d 561, 565 (1969), in which that court held, with reference to a privately-owned sidewalk outside a large grocery store:

> "Certainly, this sidewalk is not private in the sense of not being open to the public. The public is openly invited to use it in gaining access to the store and in leaving the premises. Thus, in our view *it is a public area* in which members of the public may exercise First Amendment rights." (Emphasis added.)

I agree with the statement of that principle and believe that it is applicable to rights under Article IV, section 1, of the

Oregon Constitution to gather signatures on initiative petitions.[2]

## II. ARTICLE I, SECTION 8 — FREEDOM OF SPEECH

Article I, section 8, of the Oregon Constitution provides as follows:

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; *but every person shall be responsible for the abuse of this right*." (Emphasis added.)

Courts in other states have considered the application of similar provisions of the constitutions of such states.

### A. *The State Cases*

As stated in the dissenting opinion in *Whiffen II, supra,* 315 Or at 550-51 (but in reverse order), state cases involving shopping centers may be divided into two categories:

1. Those cases from states in which courts have ruled that, under the constitutions of such states, there must be a "state action" component with respect to the private property (or the private property owner) in question before it is appropriate to consider whether particular persons' constitutional rights of expression have been violated. In this category, cases from the courts of seven states hold that under the constitutions of those states there is no such "state action" component that is inherent in the private operation

---

[2] It was held in *State v. Spencer*, 289 Or 225, 228, 611 P2d 1147 (1980), that Article I, section 8, is a prohibition upon the legislature from enacting "laws" which violate rights of free speech. It was not held in that case, however, that without a "law" or "state action" there can be no enforcement of such rights. It is important to note that Article IV, section 1, by its terms, imposes no limiting "state action" requirement.

It is contended by the state that "defendant's presence in front of the store infringed [on] Fred Meyer's First Amendment right not to speak." A similar contention was rejected by this court in *Whiffen II, supra*. There is no reason to believe that customers will think that the presence of an initiative signature gatherer implies endorsement by Fred Meyer of the subject of the petition. Fred Meyer is free, of course, to post or publish a disclaimer if it should choose to do so. Moreover, this is a criminal case brought by the state, not by Fred Meyer.

of a shopping mall, even if such a mall has become the "functional equivalent" of the traditional town square or business center.[3]

2. Cases from states with constitutions with no "state action" requirement. They include, among others, *Robins v. PruneYard Shopping Center, supra,* and *State v. Schmid, supra.* These cases proceed on the premise that their state constitutions' freedom of speech provisions provide protection not only from "abuse" by "state action," but also from "abuse" by "every person."

It is important to note that these two cases in the second category are cases from states with constitutions that have provisions remarkably similar to the provisions of Article I, section 8, of the Oregon Constitution.

### The PruneYard Case

In *Robins v. PruneYard Shopping Center, supra,* the California court, in a decision affirmed by the United States Supreme Court, 447 US 74 (1980), held that free speech and signing of initiative petitions must be permitted in shopping centers under Article I, section 2, of the California Constitution. In that case, the California court held that:

> "Though the framers could have adopted the words of the federal Bill of Rights they chose not to do so. (See Note, *Rediscovering the California Declaration of Rights* (1974) 26 Hastings L.J. 481.) Special protections thus accorded speech are marked in this court's opinions. *Wilson v. Superior Court* (1975) 13 Cal.3d 652, 658, 119 Cal.Rptr. 468, 472, 532 P.2d 116, 120, for instance, noted that '[a] protective provision more definitive and inclusive than the First Amendment is contained in our state constitutional guarantee of the right of free speech and press.' " 592 P2d at 346.

Based upon that conclusion, and without reference to any "law" or "state action" that might be applicable, the California court held that owners of the large shopping center

---

[3] The cases are *Charleston Joint Venture v. McPherson,* 417 SE2d 544 (SC 1992); *Jacobs v. Major,* 139 Wis 2d 492, 407 NW2d 832 (1987); *Western Pa. Soc. Workers. v. Connecticut Gen. Life Ins.,* 512 Pa 23, 515 A2d 1331 (1986); *SHAD Alliance v. Smith Haven Mall,* 66 NY2d 496, 498 NYS2d 99, 488 NE 2d 1211 (1985); *Woodland v. Michigan Citizens Lobby,* 423 Mich 188, 378 NW2d 337 (1985); *Cologne v. Westfarm Assocs.,* 192 Conn 48, 469 A2d 1201 (1984); and *State v. Felmet,* 302 NC 173, 273 SE2d 708 (1981).

in that case had no right to evict persons attempting to exercise rights of free speech in that shopping center and that such persons had the right to do so, subject to "reasonable regulations" to "assure that these activities do not interfere with normal business operations." 592 P2d at 347-48.

Except for the fact that the two sentences of the California Constitution are in reverse order when compared with the two phrases of Article I, section 8, of the Oregon Constitution, quoted *supra*, the two constitutional provisions are remarkably similar.

Article I, section 2, of the California Constitution provides:

> "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."

First, it is to be noted that this article of the California Constitution includes the provision that "[a] law may not restrain or abridge liberty of speech or press[,]" just as Article I, section 8, of the Oregon Constitution provides that "[n]o law shall be passed restraining the free expression * * *."

Similarly, although in reverse order compared to our Article I, section 8, Article I, section 2, of the California Constitution provides that "[e]very person * * * being responsible for the abuse of this right[,]" just as our Article I, section 8, provides that "* * * every person shall be responsible for abuse of this right."

As previously noted, the California Supreme Court quoted with approval a previous decision by that court, holding that "[a] protective provision more definite and inclusive than the First Amendment is contained in our constitutional guarantee of the right of free speech and press." 592 P2d at 346.

Thus, because Article I, section 2, of the California Constitution is a provision which contains no "state action" requirement, it follows, in my opinion, that our Article I, section 8, should also be interpreted as not requiring "state action" to "trigger" its guarantee of free speech because of its

added provision that *"every person* shall be responsible for the abuse of this right."

### The Schmid Case

Also included in the second category is the New Jersey case of *State v. Schmid, supra,* another case in which free speech provisions of a state constitution was determined to have no "state action" requirement. Again, it is significant to note that Article I, par. 6 of the New Jersey Constitution provides:

> *"Every person* may freely speak, write and publish his sentiments on all subjects, *being responsible for the abuse of that right. No law* shall be passed to restrain or abridge the liberty of speech or of the press * * *." (Emphasis added.)

Indeed, this provision is even more nearly identical to the provisions of our Article I, section 8, except for the reversal in order of its two sentences.

The New Jersey court in *State v. Schmid, supra,* 423 A2d at 626, quoted the provisions of its state constitution, as previously stated. In reaching its conclusion that this provision was not limited to "state action," that court reasoned that "[o]n numerous occasions our own courts have recognized the New Jersey Constitution to be an alternative and independent source of individual rights." *Id.* at 625.

The court then referred to one of its previous decisions, holding that " 'we have the right to construe our State constitutional provision in accordance with what we conceive to be its plain meaning.' " *Id.*

Referring to the provision of its constitution, the court stated that:

> "The constitutional pronouncements, more sweeping in scope than the language of the First Amendment, were incorporated into the organic law of this State with the adoption of the 1844 Constitution. * * * This early constitu-' tional model itself has been recognized as constituting an independent source of protectable individual rights." *Id.* at 626-27 (footnote omitted).

The New Jersey court continued by stating:

"[T]he rights of speech and assembly guaranteed by the State Constitution are protectable *not only* against governmental or public bodies, but under some circumstances *against private persons as well.* * * *

"* * * * *

"We conclude, therefore, that the State Constitution furnishes to individuals the complementary freedoms of speech and assembly and protects the reasonable exercise of those rights. These guarantees extend directly to governmental entities as well as to persons exercising governmental powers. *They are also available against unreasonably restrictive or oppressive conduct on the part of private entities* that have otherwise assumed a constitutional obligation not to abridge the individual exercise of such freedoms because of the public use of their property." *Id.* at 628 (emphasis added).

The court then went on to consider the question of what private property is subject to such restraints and what are reasonable time, place, and manner restrictions upon the exercise of the right of free speech on private property.

The free speech provisions of the California and New Jersey Constitutions provided that, *in addition* to limitations on *laws* restricting free speech, *every person* is responsible for abuse of the right of free speech. Clearly, in the absence of this added provision, both the California court in *PruneYard* and the New Jersey court in *Schmid* would have held, as held under the First Amendment to the Constitution of the United States and also under similar provisions in the constitutions of other states, that the constitutional provisions for free speech in both of those states was limited to protection against *laws* and required "state action."

## B.  *The Oregon Cases*

In *Whiffen II, supra*, plaintiff contended, and the dissent agreed, that Article I, section 8, of the Oregon Constitution protects private parties only from government "laws" and is a limitation only upon "state action." It is true that in *State v. Spencer*, 289 Or 225, 228, 611 P2d 1147 (1980), the court stated that Article I, section 8, of the Oregon Constitution "is a prohibition on the legislative branch. It prohibits

the legislature from enacting laws restraining the free expression of opinion * * *." That statement was later quoted by this court in *State v. Robertson*, 293 Or 402, 412, 649 P2d 569 (1982).

In neither of those cases, however, was the issue the question whether Article I, section 8, was *limited* to "laws." Instead, the issue in both cases was whether the laws involved in those cases were valid. In both *Spencer* and *Robertson*, the only issue was whether statutes were unconstitutionally vague or over-broad.

In neither case did this court consider the additional requirement of Article I, section 8, that "every person shall be responsible for the abuse of this right." It follows that the statement by this court in both cases to the effect that Article I, section 8, is a restriction upon the "legislative branch" was not necessary to the decision in those cases and was no more than *dictum*.

As previously noted, Article I, section 8, of the Oregon Constitution, in addition to stating that "[n]o law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever[,]" also goes on to state that "every person shall be responsible for the abuse of this right."

This added provision has been considered by this court in previous cases. In *State v. Henry*, 302 Or 510, 514, 732 P2d 9 (1987), the court stated that:

> "Since *State v. Jackson*, [224 Or 337, 356 P2d 495 (1960),] this court has related the clause holding every person 'responsible for the abuse of' the right of free expression to civil responsibility for harm done thereby."

The issue presented for decision in that case, however, was whether an obscenity law violated Article I, section 8. Prior to this case, this court has not considered whether this added provision in Article I, section 8, imposes upon private persons any "responsibility" in addition to "civil responsibility for harm done."

In my opinion, this court should adopt the reasoning by the courts of California and New Jersey in *PruneYard* and *Schmid*, that no "state action" is required to "trigger" the

guarantee of free speech, and hold that, for the same reasons, the remarkably similar provisions of Article I, section 8, of the Oregon Constitution does not require "state action" to do so.

In other words, I would hold that Article I, section 8, must be interpreted as a provision of the Oregon Constitution that protects Oregon citizens not only from "abuse" or restraint by "state action," but also, by its express terms, protects them against "abuse" or restraint by private persons.

In *Minielly v. State*, 242 Or 490, 499, 411 P2d 69 (1966), this court, in holding that the statute involved in that case violated Article I, section 8, of the Oregon Constitution, quoted with approval the following statement by the United States Supreme Court in *Sweezy v. New Hampshire*, 354 US 234, 250, 77 S Ct 1203, 1 L Ed 2d 1311 (1957):

> " 'Our form of government is built on the premise that every citizen shall have the right to engage in political expression and association.' "

And also the following statement by that Court in *Schneider v. State*, 308 US 147, 161, 60 S Ct 146, 84 L Ed 155 (1939):

> " 'This court has characterized the freedom of speech and that of the press as *fundamental personal rights and liberties*. The phrase is not an empty one and was not lightly used. It reflects the belief of the framers of the Constitution that exercise of the rights lies at the foundation of free government by free men. It stresses, as do many opinions of this court, the importance of preventing the restriction of enjoyment of these liberties.' " *Minielly v. State, supra,* 242 Or at 503-04 (emphasis added; footnote omitted).

This court should also bear in mind the following "fundamental canon" of constitutional interpretation, as stated by this court in *State ex rel Gladden v. Lonergan*, 201 Or 163, 177, 269 P2d 491 (1954) (quoting 11 Am Jur 670).

> " 'It is a fundamental canon of construction that a Constitution should receive *a liberal interpretation in favor of a citizen*, especially with respect to those provisions which were designed to safeguard the liberty and security of the citizen in regard to both person and property.' " (Emphasis added.)

"State action" should not be a "sacred cow," as the dissent apparently believes it to be. Instead, what is "sacred" should be a giving of broad protection to citizens in their "fundamental" right of free speech. In so holding, I would adopt the same interpretation of Article I, section 8, as did the California Supreme Court in *Robins v. PruneYard Shopping Center, supra,* and the New Jersey court in *State v. Schmid, supra,* in their interpretations of the remarkably similar provisions of the constitutions of California and New Jersey. As previously noted, 316 Or at 480, the decision by the California Supreme Court in *PruneYard* was approved by the Supreme Court of the United States.

Unfortunately, there is no "history" that might demonstrate the intent of those who wrote Article I, section 8. *See* Carey, History of the Oregon Constitution 100-120 (1926). If, however, a delegate to the Oregon constitutional convention had been instructed to write as an article for its Bill of Rights a guarantee of freedom of speech that would provide protection against abuse or restraint *both* by "laws" enacted by the legislature and also against abuse or restraint by private persons, it is difficult to conceive of words that would more clearly express such an intent than the words:

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right." Or Const, Art I, § 8.

For all of these reasons, I would hold that the provision of Article I, section 8, "every person shall be responsible for the abuse of this right," should be interpreted not as virtually meaningless words, but by giving these words their plain, clear and literal meaning, so as to extend the protection of free speech from "abuse" or restraint not only by "state action," but also from "abuse" or restraint by "private persons."

Accordingly, I would hold that Fred Meyer is a "person" responsible for the "abuse" of defendant's right of free speech; that defendant, in seeking signatures on initiative petitions while standing on the sidewalk near the entrance to this store, was thereby attempting to exercise his constitutional right of free speech; that his right to do so under Article I, section 8, was entitled to recognition by the owners of this

Fred Meyer "one-stop shopping center," subject to reasonable time, place, and manner restrictions, and that, as a result, and under the facts of this case, Fred Meyer "abused" defendant's right of free speech by having him arrested for criminal trespass.

In my opinion, the time will come, sooner or later, when this court will abandon its presently restrictive interpretation of Article I, section 8, and give the words of its provision requiring "every person" to be "responsible for the abuse of this right" to freedom of speech their plain, clear and literal meaning.

## III. DELAYS ON APPEAL

As a former member of this court who has always been devoted to this court as one of the best in the nation, it is difficult for me to be critical of its operation. I strongly believe, however, that the problem of delays on appeals to this court has become so serious as to make appropriate the writing of a concurring opinion calling attention to this problem.

This is not my first opinion concurring in a decision by this court, but expressing concern over long delays between oral arguments and decisions. *See, e.g., State v. Classen,* 285 Or 221, 238, 590 P2d 1198 (1979); *State v. Quinn,* 290 Or 383, 407, 411, 623 P2d 630 (1981).

This case was argued on March 6, 1992. After mostly unnecessary delays for 13 months, it was reassigned on April 7, 1993, to Justice Van Hoomissen. Meanwhile, awaiting a decision of this case, the court withheld decision on a petition for review in *State v. Cargill,* 316 Or 492, 851 P2d 1141 (1993), also a criminal trespass case involving rights of persons seeking signatures on initiative petitions near the entrance to another Fred Meyer store. That case was argued on November 6, 1990 — two and one-half years ago.

Upon inquiry, I find that long delays between oral arguments and final decisions by this court have not been unusual. Of 115 "signed" opinions in 1992 (not including per curiam or memorandum opinions), 28 were not decided until more than one year had elapsed after oral argument, including 10 cases not decided until 18 or more months after oral

argument. Only 24 of these cases were decided within 90 days after oral argument. In addition to *State v. Cargill, supra,* one other case remains undecided after over two years.

For the first four months of this year, ending May 1, 1993, there have been only 31 "signed opinions," 15 of which were decided within 90 days, while 9 were not decided until more than 12 months after oral argument, including 4 not decided for more than 18 months.

The Standards Relating to Appellate Courts, as adopted by the American Bar Association Commission on Standards of Judicial Administration (1977), provide for Standards of Timely Disposition, including Section 3.52(b)(4), which provides as follows:

> *"Decision.* For a court sitting in panels of three judges, the average time for rendering decision should not exceed 30 days; the maximum time for any case, except one of extraordinary complexity, should not exceed 60 days. For a court sitting in larger panels, the average time should not exceed 60 days; *the maximum time, except in cases of extraordinary complexity, should not exceed 90 days."* (Emphasis added.)

ORS 1.050 provides that all Oregon trial judges shall sign a "Certificate of Compliance," as a condition for payment of their salaries, that they have no cases under advisement or undecided for more than three months "unless prevented by sickness or unavoidable casualty, or the time be extended by stipulation in writing[.]" Because of an opinion by the Oregon Attorney General that this statute is unconstitutional, it is no longer enforced. It does, however, state the view of the citizens of Oregon, through their elected representatives, that courts should ordinarily decide cases within 90 days.

This court is no longer required to hear all cases appealed to it, but hears mostly cases which it chooses to hear by the granting of petitions for review of decisions by the Court of Appeals. Because, as a result, this court can now control the number of cases to be heard and decided by it, there is no good reason why it should be unable to decide promptly those cases which it chooses to hear.

Upon further inquiry, I am told that the following efforts have been and are being made to correct the problem of delays on appeal, with the following results:

The court does promptly consider many cases other than those it decides by signed, published opinion following oral argument. The court considers about 1,000 petitions for review or for mandamus each year and analyzes each in an unpublished opinion; review is denied in approximately 90 percent of those cases in a decision that generally takes only about 60 days from the time of filing. The cases in which the court allows review are the legally challenging ones, and the delayed cases normally are the most challenging of all. The court's attempts to reach consensus on thorny issues of law is a process more time-consuming (and exasperating) than the parties, their lawyers, or the trial court judges imagine.

The court realized about two years ago that, justifiable or not, decisional delay had become a serious problem. Serious efforts were undertaken to reduce the court's backlog and to issue opinions more promptly. All seven justices agreed to revised internal procedures designed to hasten circulation and publication of opinions. The result has been a sharp decrease in the backlog and a marked improvement in the time for decision.

A year ago, before May oral arguments, the court had a backlog of 88 cases. This year, at the same time, only 34 cases were under advisement. Among those 34 cases, two-thirds had been argued within the past six months. Of the older cases, most have been reassigned after the court repeatedly tried but failed to agree upon either the rationale or the result proposed by the assigned author; after reassignment, opinions generally are published within weeks. The "backlog" is shrinking fast and is expected to disappear entirely within months. Already this year, 13 of the older "backlog" cases have been published. Only five cases remain that are more than a year old.

Among signed opinions published in 1992, only 21 percent were issued within 90 days of argument. In 1993, nearly half of all the published opinions were issued within 90 days of argument. The majority of new cases the court hears this year will be published within 90 days. Of the 46 cases

argued from January through April of 1993, 26 already have been decided.

These efforts by the court and, in particular, by the Chief Justice, to overcome the problem of delays in its decisions and the apparent success of such efforts, as indicated by these current statistics, should come as welcome news to both the bar and the public.

It remains to be seen, of course, whether these efforts will continue to be successful.

Cases appealed to this court involve serious concerns of real people, such as those of defendants in criminal cases who contend that their convictions must be reversed because their constitutional rights have been violated, as in this case, and persons trying to collect substantial sums of money as the result of judgments for personal injury or breach of contract. These people are entitled to reasonably prompt decisions by a court that is efficient in its operation.

To people such as these, and to many others, *"Justice delayed is justice denied."*

**PETERSON, J.,** specially concurring in part and dissenting in part.

Although I join in the dissenting opinion of Gillette, J., I specially concur with the lead opinion in this respect: *Lloyd Corporation v. Whiffen*, 315 Or 500, 849 P2d 446 (1993) (*Whiffen II*), held that Article IV, section 1, of the Oregon Constitution, gives initiative petition circulators the right to circulate initiative petitions at the Lloyd Center. Given the holding of *Whiffen II*, the lead opinion in this case is correct in its holding that "it was incumbent on the state to prove beyond a reasonable doubt at trial that the Fred Meyer 'one-stop shopping center' * * * was *not* analogous to the shopping center in *Whiffen*." 316 Or at 461-62 (emphasis in original). In future cases involving prosecution of initiative petition circulators under ORS 164.245, the prosecution must "prove, not only that the person in charge directed the defendant to leave the premises, *but also* that the direction to leave the premises was lawful, *i.e.*, that the defendant had no legal right to ignore the direction to leave." *Id.* at 460 (emphasis in original).

I join in the dissenting opinion of Gillette, J., because initiative petition circulators have no right under Article IV, section 1, of the Oregon Constitution, to circulate petitions on privately owned premises such as those involved in this case and in *Whiffen II.*

**GILLETTE, J.,** dissenting.

Starting with a bad idea and then trying to expand upon it produces results like that reached in this case. This is a case of a trespasser who indisputably was on private property and was ordered to leave that property by a person who was in charge of the property. The majority nonetheless reverses the trespasser's conviction for criminal trespass on the ground that the state failed to disprove, beyond a reasonable doubt, the "defense" that the trespasser was engaged in constitutionally protected activity, *viz.,* petition signature gathering.[1] The principal fault with the majority's approach lies in its unspoken major premise, which is that the activity in question *could be* (the majority declines to determine that, in this case, it *is*) constitutionally protected. As I believe that I have demonstrated in *Lloyd Corporation v. Whiffen,* 315 Or 500, 528-56, 849 P2d 446 (1993) (*Whiffen II*) (Gillette, J., dissenting), there is no such constitutional right to gather petition signatures on private property. It follows that the defendant had no "defense" that the state had to disprove, and that his conviction for criminal trespass therefore should be affirmed.

Carson, C. J., and Peterson, J., join in this dissenting opinion.

---

[1] There is no single majority opinion, but the disposition to which I refer is agreed upon by four members of the court.